785 A.2d 65 (2001)
345 N.J. Super. 360
Philip ALAMPI, Plaintiff-Appellant,
v.
Albert RUSSO, Esquire and Zager, Fuchs & Chianese, P.C., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 17, 2001.
Decided November 29, 2001.
*66 Tina L. Colman, Philadelphia, PA, argued the cause for appellant (Weir & Partners, attorneys; Ms. Colman and Brett A. Datto, on the brief).
Scott D. Samansky, argued the cause for respondent Zager, Fuchs & Chianese, East Hanover (Fishman & Callahan, Red Bank, attorneys; Mr. Samansky, on the brief).
Christopher J. Carey, Morristown, argued the cause for respondent Albert Russo (Graham Curtin & Sheridan, attorneys; Mr. Carey and Kathleen A. Murphy, on the brief).
Before Judges KING, CUFF and WECKER.
The opinion of the court was delivered by KING, P.J.A.D.
This is a professional malpractice action by a licensed public accountant brought against his former criminal defense attorney. The plaintiff claims his attorney's professional negligence caused him to plead guilty under oath to a federal misdemeanor charge: refusing to give information to the IRS in a tax investigation. We conclude that the plaintiff client cannot now seek in a civil action to renounce his federal conviction based on his guilty plea, which he has never otherwise attacked, and seek money damages for a wrongful conviction against his attorneys.

I
This is an appeal from a grant of summary judgment to defendants. On September 27, 1999 plaintiff Philip Alampi filed a professional malpractice complaint against defendants, his former attorney Albert Russo, Esq., and the law firm of Zager, Fuchs & Chianese, P.C. On May *67 1, 2000 the late Judge Mochary granted the defendants' motion for summary judgment, finding no genuine issue of material fact and the defendants were entitled to judgment because public policy precluded this action.
Plaintiff supplied accounting services to Dr. John Kelly and Dr. Michael Gentile in their medical practice, Family Care, in Bloomfield, Essex County. The record discloses that sometime between 1991 and 1993, Marie Pulio, an employee of Family Care, told plaintiff that checks which should have been deposited into the medical practice's operating account were missing. Plaintiff spoke with Gentile about these supposedly missing checks. Plaintiff said Gentile told him to ignore Pulio's statement. Later Pulio told plaintiff of additional missing checks and that the operating account was overdrawn. Plaintiff again inquired but Gentile and Kelly gave him no information about the alleged missing deposits.
In July 1995, Kelly and Gentile told plaintiff they were being investigated by the IRS. Both Kelly and Gentile retained legal counsel. Plaintiff met with the doctors' attorneys and they advised him to retain his own attorney.
In August 1995 plaintiff hired defendant Russo and a meeting with the IRS was scheduled. At the beginning of the meeting, the IRS agents read plaintiff his Miranda warnings and Russo advised plaintiff not to answer any questions. In November 1995 Russo and the doctors' attorneys asked plaintiff to sign two documents: (1) a joint defense memorandum and agreement, dated November 15, 1995, and (2) an affidavit dated November 28, 1995 stating that plaintiff had made mistakes in preparing the taxes for Family Care, Kelly and Gentile. Plaintiff refused to sign either.
On December 20, 1995 Russo sent a letter to plaintiff explaining his situation and memorializing Russo's advice. In the letter, Russo stated, "the complexities of the case have changed in that the IRS is now including you in their investigation for potential criminal referral." Russo advised plaintiff to assert his Fifth Amendment privilege and not to discuss the case with the IRS without a grant of immunity. Russo at that time told plaintiff he had the option to provide the IRS with further information, but he advised against that course. His letter stated, "Agent Lessoff has clearly indicated to me that a mere denial by you of the factual allegations made against you will not convince him to discontinue his inquiries." Finally, Russo advised Alampi that he could seek the opinion of other counsel on how to proceed. Alampi discharged Russo and retained his present counsel.
On April 13, 1998 Alampi was indicted for violations of 18 U.S.C. § 371 (conspiracy to defraud by preparing false and fraudulent tax returns); 26 U.S.C. § 7203 (failure to supply information); and 26 U.S.C. § 7206(2) (fraud and false statements). During trial, on August 4, 1998, Alampi pled guilty to a misdemeanor, one count of failing to supply information with regard to an IRS investigation in violation of 26 U.S.C. § 7203. The doctors were acquitted on August 7. On November 6, 1998 Alampi was sentenced to twelve months of unsupervised probation and a fine of $2000.
As noted, on September 27, 1999 Alampi filed this legal malpractice complaint for damages against the defendants. In rendering his decision, Judge Mochary stated that while there was no precedent in New Jersey on this public policy issue, he was persuaded by the Texas Supreme Court's reasoning in Peeler v. Hughes & Luce, 909 S.W.2d 494 (Tex.1995) (4-3 decision). *68 Judge Mochary granted defendant's motion for summary judgment because plaintiff pled guilty and was precluded as a matter of public policy from renouncing that plea and bringing a legal malpractice action.

II
We now consider the guilty plea entered under oath by plaintiff before United States District Court Judge Simandle on August 4, 1998. The entire guilty plea colloquy is reproduced as Appendix A to this opinion. Here we include only the most pertinent part of this meticulous and precise discourse conducted by Judge Simandle.
THE COURT [Judge Simandle]: All right. Then I'll ask these questions in order to determine whether there is a factual basis for accepting this plea.
First, did you provide accounting services to John Kelly, Michael Gentile and their medical practice, Family Care Medicenter, which is located in Bloomfield, New Jersey?
THE DEFENDANT: Yes, I did.
****
THE COURT: In or about July of 1995 did Dr. Kelly and Dr. Gentile tell you that they were in trouble with the IRS for a bank account that was missing from their tax returns?

THE DEFENDANT: Yes.
THE COURT: Did they say that they would need you to say that you made a mistake?
THE DEFENDANT: Yes.
THE COURT: Was it your understanding from your conversation with them that they wanted you to say that, that you had made a mistake even if you had not?
THE DEFENDANT: Yes.
THE COURT: Later that same day, in or about July of 1995, were you interviewed by the IRS?

THE DEFENDANT: Yes.
THE COURT: Did you fail to inform the IRS about the fact that the doctors wanted you to say that you made a mistake when you believed that you had not?
THE DEFENDANT: Yes, I did.
THE COURT: Am I correct that you believed that you had not made a mistake?
THE DEFENDANT: I didn't. I thought I was protecting my interests and everybody else's. I thought that was my duty at the time.
THE COURT: Did you also fail to inform the IRS about the information you possessed about missing checks and deposits related to the medical partnership?
THE DEFENDANT: I'm sorry.
THE COURT: Yes, did you fail to inform the Internal Revenue Service about the information you possessed about missing checks and deposits related to the medical partnership?
THE DEFENDANT: Yes.
THE COURT: In doing so, did you assist Dr. Kelly and Dr. Gentile in their failure to supply information to the IRS as they were required to do under law?
THE DEFENDANT: Yes, I did.
THE COURT: Did you do so knowingly and willfully, that is, voluntarily and with the knowledge that by not disclosing the information that you had received you willfully assisted Dr. Kelly and Dr. Gentile in their failure to provide information required by law?
THE DEFENDANT: Yes.
****
*69 THE COURT: Mr. Pollack [Assistant United States Attorney], do you believe also that there's a factual basis?
MR. POLLACK: Yes, I do, your Honor.

[Emphasis added.]
At the time of this meticulously conducted proceeding during which plaintiff pled guilty to a federal crime before Judge Simandle, he was represented by Walter Weir, Esq., his present counsel in this professional liability action. Plaintiff neither appealed from this conviction nor sought to collaterally attack it in any federal proceeding for post-conviction relief.
Plaintiff contends in this malpractice case that Russo neglected to keep him properly informed about the potential of a criminal investigation proceeding and failed to arrange for a meeting with the IRS in the fall of 1995, where the government could have been persuaded to either grant him transactional immunity or decline to prosecute him. Russo retorts that the government never indicated any inclination to immunize or deal leniently with plaintiff. In our view, plaintiff basically argues that more skillful representation by Russo might possibly have brought him through unscathed. There is no evidence presented to support this view.
Plaintiff pled guilty to the crime of failing to supply information with regard to an IRS investigation, 26 U.S.C.A. § 7203, which he swore under oath he committed before Russo started to represent him. Plaintiff now wants to renounce this guilty plea, from which he presumably benefitted, and attempt to collect damages. We reject this theory of recovery. There is neither plausible causation nor tenable public policy grounds for plaintiff's claim.
Our New Jersey public policy on the necessity for an honest factual basis for a guilty plea is very clear. The judge "shall not accept [a guilty] plea without first addressing the defendant personally and determining by inquiry of defendant... that there is a factual basis for the plea...." R. 3:9-2; Pressler, Current N.J. Court Rules, comment 1 on R. 3:9-2. In New Jersey, the judge must be "satisfied from the lips of the defendant that he committed the acts which constitute the crime." State v. Barboza, 115 N.J. 415, 422, 558 A.2d 1303 (1989) (quoting State v. Stefanelli, 78 N.J. 418, 439, 396 A.2d 1105 (1979) (Schreiber, J., concurring)).
The requirements of a factual basis for a plea "serves a variety of purposes." State v. Barboza, 115 N.J. at 421, 558 A.2d 1303.
In particular, it is designed to "protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge." Fed.R.Crim.P. 11(F) advisory committee note (1966 amendment). See also McCarthy [v. U.S.], supra, 394 U.S. [459] at 467, 89 S.Ct. [1166] at 1171, 22 L.Ed.2d [418] at 426; United States v. Fountain, 777 F.2d 351, 355 (7th Cir. 1985). The factual basis requirement also affords the court an opportunity to observe the conditions under which the plea is made, provides a better record for appellate review if the plea is subsequently challenged, increases the visibility of charge-reduction practices, and aids correctional agencies in the performance of their functions. See W. LaFave & J. Israel, 2 Criminal Procedure, § 20.4(f) (1984).

[Ibid.]
The cognate federal policy is equally strong. F.R.Crim. P. 11(f) requires upon acceptance of a guilty plea that "the court shall not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." Three decades ago Chief Justice *70 Warren stated that R. 11(f) was designed in part to insure that a "defendant's guilty plea is truly voluntary." McCarthy v. United States, 394 U.S. 459, 465, 89 S.Ct. 1166, 1170, 22 L.Ed.2d 418, 425 (1969). The Chief Justice observed that "the more meticulously the Rule is adhered to, the more it tends to discourage, or at least enable more expeditious disposition of, the numerous and often frivolous post-conviction attacks on the constitutional validity of guilty pleas." Ibid. See Libretti v. United States, 516 U.S. 29, 42, 116 S.Ct. 356, 364, 133 L.Ed.2d 271, 285 (1995) (reaffirming McCarthy).
Analogously, a few years ago, the United States Supreme Court alluded to "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments" when denying relief to a prisoner's § 1983 action for money damages, akin to an action for malicious prosecution, which required plaintiff to prove he was unlawfully convicted in the first instance. Heck v. Humphrey, 512 U.S. 477, 486, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383, 393 (1994). To recover damages for an alleged invalid conviction, Justice Scalia, for the Court, said the plaintiff must first prove "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 487, 114 S.Ct. at 2372. A claim for damages "that has not been so invalidated is not cognizable under § 1983." Id. at 487, 114 S.Ct. at 2372. We apply that principle here.
The plaintiff's thesis for recovery in this case also undermines the public policy expressed by the doctrine of judicial estoppel. In the context of casino licensing, our Supreme Court held that an employee could not renounce his earlier guilty pleas to drug charges at a later license revocation proceeding. State Dept. of Law & Public Safety v. Gonzalez, 142 N.J. 618, 632, 667 A.2d 684 (1995). Justice Coleman expressed the judicial policy this way:
When Gonzalez entered his guilty pleas, he swore that he conspired to possess and distribute marijuana and that he possessed marijuana with the intent to distribute it within a school zone. His subsequent attempt to change his testimony at the license revocation hearing indicates that he was playing fast and loose with the courts and the casino regulators. The Act does not tolerate such conduct. He benefitted from his guilty pleas by receiving a lenient sentence. After completing the probationary sentence, he then denied his guilt in the license revocation proceeding in an attempt to show not only that he was rehabilitated, but that he had not committed a disqualifying offense. Thus, Gonzalez "had his cake and he ate it too." Duplan Corp. v. Deering Milliken Inc., 397 F.Supp. 1146, 1177 (D.S.C. 1974). Judicial estoppel protects the integrity of both the judicial process and the casino industry when the Commission acts in its quasi-judicial capacity.
[Id. at 632, 667 A.2d 684.]
See Levin v. Robinson, Wayne & LaSala, 246 N.J.Super. 167, 178, 586 A.2d 1348 (Law Div.1990) ("The doctrine of judicial estoppel prevents a party from arguing contradictory positions in different actions in court.").

III
This case presents a novel issue in this jurisdiction: whether an unimpeached guilty plea in a criminal proceeding bars recovery in a legal malpractice action. See McGrogan v. Till, 327 N.J.Super. 595, 606-09, 744 A.2d 255 (App.Div.2000) (discussing *71 but not deciding this issue), affirmed and modified, 167 N.J. 414, 771 A.2d 1187 (2001). Many jurisdictions require "appellate or other post-conviction relief as a predicate to recovery in a criminal malpractice action." Coscia v. McKenna & Cuneo, 25 Cal.4th 1194, 108 Cal. Rptr.2d 471, 25 P.3d 670, 674 (2001); see Berringer v. Steele, 133 Md.App. 442, 758 A.2d 574 (Spec.App.2000)(absent relief from a conviction or sentence, the criminally convicted plaintiff's own actions are presumably the proximate cause of injury); Labovitz v. Feinberg, 47 Mass.App.Ct. 306, 713 N.E.2d 379 (Mass.1999)(public policy considerations require that an undisturbed guilty plea precludes plaintiff from pursuing a civil malpractice claim); Morgano v. Smith, 110 Nev. 1025, 879 P.2d 735 (1994)(plaintiff must obtain post-conviction relief in order to overcome a motion for summary judgment); Bailey v. Tucker, 533 Pa. 237, 621 A.2d 108 (1993)(a plaintiff will not prevail in an action in malpractice unless and until post-trial remedies are secured); Shaw v. State, Dept. of Admin., 816 P.2d 1358 (Alaska 1991)(convicted criminal must obtain post-conviction relief before pursuing an action for malpractice).
In granting the motion for summary judgment, Judge Mochary relied strongly on Peeler v. Hughes & Luce, 909 S.W.2d 494 (Tex.1995) (4-3 decision). In Peeler, the Texas Supreme Court held that because of public policy considerations, "plaintiffs who have been convicted of a criminal offense may negate the sole proximate cause bar to their claim for legal malpractice in connection with that conviction only if they have been exonerated on direct appeal, through post-conviction relief, or otherwise." Id. at 497-98. The Texas court explained that public policy prohibits a convicted person from profiting from his illegal conduct and by allowing civil recovery, a convicted criminal defendant can impermissibly shift responsibility for the crime onto the defense attorney. Id. at 498. The court said: "This opportunity to shift much ... of the punishment assessed against convicts for their criminal acts to their former attorneys, drastically diminishes the consequences of the convicts' criminal conduct and seriously undermines our system of criminal justice." Ibid. The court concluded that in order for a plaintiff to recover for legal malpractice, causation must be proven. A plaintiff who has not been exonerated cannot recover damages because "her illegal acts remain the sole proximate and producing causes of her indictment and conviction as a matter of law." Ibid.
The California Supreme Court has also held that exoneration from the criminal offense is required in order for a plaintiff to recover in a legal malpractice action because "public policy considerations require that only an innocent person wrongly convicted be deemed to have suffered a legally compensable harm." Coscia v. McKenna & Cuneo, 25 Cal.4th 1194, 108 Cal.Rptr.2d 471, 25 P.3d 670, 674 (2001). In justifying its conclusion, the California court stated three public policy considerations: (1) permitting a convicted criminal to pursue a legal malpractice claim without requiring exoneration would allow a criminal to profit by his own fraud, (2) allowing recovery would impermissibly shift responsibility away from the criminal, and (3) "guilty defendants have an adequate remedy in the form of post-conviction relief for ineffective assistance of counsel." Id. at 673.
The California high court discussed the actual innocence requirement with regard to guilty pleas or a plea agreement stating "[a]lthough a plaintiff may wish that he... had gotten a better deal, we do not consider it appropriate ... to treat a convicted offender as having been caused `harm' in a legally cognizable way...." *72 Id. at 675 (quoting Stevens v. Bispham, 316 Or. 221, 851 P.2d 556, 562 (1993)). The court also referred to "the duty imposed upon judges under both Federal practice and [state] practice to assure not only that guilty pleas are knowingly, intelligently, and voluntarily offered and that there is a factual basis for each crime to which a plea is tendered, but also that the defendant's Sixth Amendment right to effective assistance of counsel has been honored." Ibid. (quoting Labovitz v. Feinberg, 47 Mass.App.Ct. 306, 713 N.E.2d 379, 383 (Mass.1999)). The California court stated that the innocence requirement protects against inconsistent verdicts, promotes judicial economy, and encourages the representation of criminal defendants by reducing the risk of baseless malpractice actions. Id. at 675-76.
Conversely, in Krahn v. Kinney, 43 Ohio St.3d 103, 538 N.E.2d 1058 (1989), the Ohio Supreme Court has held that a plaintiff does not need to obtain post-conviction relief before creating a jury issue in a legal malpractice claim. In Krahn, the plaintiff's claim was based on her attorney's failure to communicate a prosecutor's offer. The Court stated the facts of this case made apparent the inequity of requiring a plaintiff to obtain a reversal of the criminal conviction prior to bringing a malpractice action. Id. at 1061. The Court observed, however, that a plaintiff's failure to obtain exoneration of the underlying criminal conviction could destroy the ability to establish proximate cause as a factual matter. Id. at 1062. See also Jepson v. Stubbs, 555 S.W.2d 307, 313 (Mo.Sup.Ct. 1977). The national split in authority is discussed in Gebhardt v. O'Rourke, 444 Mich. 535, 546, 510 N.W.2d 900, 905 fn. 11 (1994), and, to an extent, this question is intertwined with the issue of when the statute of limitations begins to run.
In the case before us, the plaintiff plead guilty to failure to provide information to the IRS. Plaintiff in hindsight asserts that this criminal conduct somehow was caused by defendant Russo's failure to convey information to him about the federal government's alleged conciliatory posture. Defendants assert that plaintiff pled guilty to conduct which clearly occurred before plaintiff obtained Russo as counsel.
We decline to allow plaintiff here to go behind his federal guilty plea. He clearly and unconditionally pled guilty to a criminal offense committed before Russo's representation arose. To permit this action would undermine the integrity of the federal guilty plea in pursuit of a highly speculative thesisthat plaintiff would have achieved an "optimum outcome" of no prosecution if his first attorney had in retrospect used different tactics.
We need not and do not reach the question of the requirement for exoneration from a criminal conviction in all cases before a plaintiff in this type of case can make out a jury issue. A more propitious fact pattern for a plaintiff perhaps may emerge in a future case; thus, for now, we eschew a "bright line" rule requiring exoneration in all cases. See Delbridge v. Office of Pub. Def., 238 N.J.Super. 288, 311, 569 A.2d 854 (Law Div.1989), affirmed o.b., 297 N.J.Super. 1, 687 A.2d 748 (App.Div. 1993) (general duty of care of defense counsel in criminal cases). We understand plaintiff's desire to see the race rerun but we perceive no public policy justification for this action now before us.
Affirmed.
APPENDIX A

ENTIRE PLEA COLLOQUY BEFORE JUDGE SIMANDLE ON AUGUST 4, 1998
THE COURT: All right. Just a few preliminary questions as well for Mr.

*73 Pollack [the Assistant United States Attorney]. Mr. Pollack, is this plea agreement the complete agreement between your office and the defendant Alampi?
MR. POLLACK: Yes, it is, your Honor.
THE COURT: Have you signed the plea agreement letter and has it been approved by Patty Schwartz?
MR. POLLACK: Yes, it has, and yes I have.
THE COURT: Has it also been approved by the Tax Division of the Department of Justice?
MR. POLLACK: Yes, it has, your Honor.
THE COURT: Okay. And do you know of any reason why I should not accept this defendant's plea of guilty at this time?
MR. POLLACK: No, I do not.
THE COURT: Okay. All right. And, Mr. Weir, did you witness your client's signature on the plea agreement?
MR. WEIR [defense counsel]: Yes, I did.
THE COURT: And did you also sign the plea agreement?
MR. WEIR: Yes, I did.
THE COURT: And did that occur today, August 4th?
MR. WEIR: Yes, it did.
THE COURT: Similarly, with regard to the plea of guilty, did you sign the certification of counsel page?
MR. WEIR: Yes, I did.
THE COURT: And did you witness your client's signature on page seven?
MR. WEIR: Yes, I did.
THE COURT: All right. Then, Mr. Alampi, please rise. I'd like to ask Mr. O'Brien to place you under oath.
(Philip Alampi, sworn.)
THE COURT: Am I correct that Philip is P-h-i-l-l-i-p?
THE DEFENDANT: One L.
THE COURT: One L? Well, the first problem then is the name ... on the criminal information.
MR. POLLACK: The United States then moves to amend the information to correctly spell the name as with one L, your Honor.
THE COURT: All right. I'm going to hand the original back and ask you to pen and ink the change in the caption, and I'll deem the change in the caption to apply to every paragraph in which the incorrect spelling was used. Just goes to prove that there's no question that's too obvious.
Now, Mr. Alampi, you've been placed under oath. Do you know that if you knowingly give me a false answer you could be subject to [a] penalty of perjury?
THE DEFENDANT: Yes, I do.
THE COURT: If I ask you anything that you don't understand, then just ask me to clarify it and I'll be glad to do so; will you do that?
THE DEFENDANT: Yes.
THE COURT: Don't be embarrassed. If there's anything you don't understand, just tell me so and I'll do my best to make it clear.
Also, if at any time you need to discuss anything with your attorneys, tell me so. We'll take a break so that you and your attorneys can have whatever discussions you need to have before we go forward; will you do that?
THE DEFENDANT: Yes.
THE COURT: Do you understand that you can, if I accept your plea of guilty today, you can never come back another day and say, Judge, I changed my mind *74 or, Judge, there's something I didn't understand back on August 4th?
THE DEFENDANT: I understand.
THE COURT: These questions may take some time so you can be seated.
Have you read the criminal information that has been filed this morning in this Court?
THE DEFENDANT: Yes, I have.
THE COURT: Have you gone over it with your attorneys?
THE DEFENDANT: Yes, I have.
THE COURT: Do you understand it?
THE DEFENDANT: Yes.
THE COURT: Do you believe yourself guilty of this charge?
THE DEFENDANT: Yes, I do.
THE COURT: I'm told that you've filled out this application for permission to enter a plea of guilty, Exhibit C 1 is that correct?
THE DEFENDANT: That's correct.
THE COURT: Did you read C-1 on page seven?
THE DEFENDANT: Yes, I did.
THE COURT: Did you understand everything on it?
THE DEFENDANT: Yes, I do.
THE COURT: And did you sign C 1 on page seven?
THE DEFENDANT: Yes, I did.
THE COURT: [I was] also told that you have a written plea agreement with the U.S. Attorney contained in exhibit C-2, the letter of August 4th, 1998. Do you recognize this as your written plea agreement?
THE DEFENDANT: Yes.
THE COURT: Is there any aspect of your plea agreement that is not in writing?
THE DEFENDANT: No.
THE COURT: Has anyone made you any promises that are not contained in this written plea agreement?
THE DEFENDANT: No.
THE COURT: Do you have any understandings [that are] different from this written plea agreement?
THE DEFENDANT: No.
THE COURT: Have you had enough time to go over this written plea agreement with your attorneys?
THE DEFENDANT: Yes.
THE COURT: Have you read it?
THE DEFENDANT: Yes, I have.
THE COURT: And do you understand it?
THE DEFENDANT: Yes, I do.
THE COURT: Have your attorneys answered any and all questions that you may have about this plea agreement?
THE DEFENDANT: They have.
THE COURT: And do you accept this plea agreement?
THE DEFENDANT: I do.
THE COURT: Are you pleading guilty [on] your own free will?
THE DEFENDANT: Yes, I am.
THE COURT: Has anyone threatened you to force you to plead guilty?
THE DEFENDANT: No.
THE COURT: Are you satisfied with the services and the efforts of your attorneys?
THE DEFENDANT: Yes, I am.
THE COURT: Do you have any difficulty understanding what's going on here?
THE DEFENDANT: No, I don't.
THE COURT: Are you under the influence of any drugs, alcohol or medication?
THE DEFENDANT: No, I'm not.

*75 THE COURT: And have you consumed any drugs, alcohol or medication in the last 24 hours?
THE DEFENDANT: Yes.
THE COURT: And what have you consumed?
THE DEFENDANT: Vasatek.
THE COURT: And what does that what do you take Vasatek for?
THE DEFENDANT: For blood pressure.
THE COURT: And does that have any effect on your ability to understand or comprehend?
THE DEFENDANT: No, it doesn't.
THE COURT: And have you consumed anything else?
THE DEFENDANT: Excuse me?
THE COURT: Have you consumed any other drug, alcohol or medication?
THE DEFENDANT: No, I haven't.
THE COURT: Now, before I can accept a plea of guilty, I have to determine whether you understand the important Constitutional rights that you have as a person facing this charge, and by this charge I mean the misdemeanor charge contained in the information of today's date. Do you understand that you have a right to trial by jury?
THE DEFENDANT: Yes, I do.
THE COURT: And do you understand that at that trial, you would have the right to be represented by counsel, you'd have the right to confront witnesses against you, the right to subpoena witnesses on your own behalf, and the right to choose to testify or [not to] testify as you see fit?
THE DEFENDANT: Yes, I do.
THE COURT: Do you understand that if you [chose] not to testify, that the jury would be so advised, and that your silence could not be held against you because you have a right to remain silent; do you understand that?
THE DEFENDANT: Yes, I do.
THE COURT: You also understand there would be no burden placed upon you at that trial? Instead, the entire burden of proving your quilt is placed upon the government and they must prove guilt, beyond a reasonable doubt, or else [you] cannot be convicted; you understand that?
THE DEFENDANT: Yes, I do.
THE COURT: Do you understand that you are entitled to the presumption of innocence on this misdemeanor charge, and that if you plead guilty, you would be giving up the presumption of innocence; do you understand that?
THE DEFENDANT: Yes, I do.
THE COURT: Do you also understand that if you plead guilty, you would be admitting your guilt on the misdemeanor charge?
THE DEFENDANT: Yes, I do.
THE COURT: And do you understand that if you plead guilty, you could never come back another day and say I'm not guilty of that misdemeanor charge?
THE DEFENDANT: Yes.
THE COURT: And is that what you still wish to do?
THE DEFENDANT: Yes, I do.
THE COURT: Do you understand that a plea of guilty is the equivalent of a finding of guilt after a trial on the misdemeanor charge?
THE DEFENDANT: Yes, I do.
THE COURT: Do you understand that I am the sentencing Judge and that I don't know what your sentence [will] be, and that the only promise I can make you is that your sentence [will] not exceed the maximum penalties provided by law? *76 THE DEFENDANT: Yes, I do.
THE COURT: And do you understand that those penalties are set forth in your plea agreement letter dated August 4th 1998? Do you have a copy of your plea agreement letter in front of you?
THE DEFENDANT: Yes, I do.
THE COURT: Did you sign this plea agreement letter on page four?
THE DEFENDANT: Yes, I did.
THE COURT: And did you do so earlier this morning?
THE DEFENDANT: Yes.
THE COURT: Now, as to the maximum penalties provided by law for the offense of aiding and abetting, and in violation of section 7203, as charged in this criminal information, do you understand that you could be sentenced up to one year in prison?
THE DEFENDANT: Yes, I do.
THE COURT: Do you also understand you could be sentenced to a fine of up to a hundred thousand dollars?
THE DEFENDANT: Yes, I do.
THE COURT: And do you understand that in addition to any term of imprisonment, you [could] also be sentenced to a period of supervised release of up to one year?
THE DEFENDANT: Yes, I do.
THE COURT: And do you understand that supervised release means that you would be living in the community under the supervision of a Probation Officer, and that if you violated any term or condition of your supervised release, that it could be revoked after a hearing and that you could be reimprisoned for an additional term of up to one year? Do you understand that?
THE DEFENDANT: Yes, I do.
THE COURT: Now, included in the maximum penalties provided by law are also the following: I can order, I must order a special assessment of $25. I can order you to pay restitution pursuant to section 3663 and section 3664. I can order notice to any victim of this offense. I'm not sure that's relevant, but I'll include it for the sake of completeness anyway. And also you can be required to pay the cost of prosecution. I didn't see that included. Isn't that part of the consequences of a plea of guilty?
MR. POLLACK: Yes, it is, your Honor.
THE COURT: I don't believe the parties have overlooked it. It was in the government's plea memorandum of today's date, I believe, or am I mistaken?
MR. WEIR: We both agree to that, your Honor.
THE COURT: All right. And is that also your understanding, Mr. Alampi, that
THE DEFENDANT: Yes, it was my understanding.
THE COURT: Okay. Now, your sentence will also be determined with respect to the United States Sentencing Guidelines that have been enacted by Congress; that there will be a probation report prepared by our Probation Department; that [the] presentence investigation will include all the pertinent data about this offense and your participation in it, that as part of the Sentencing Guideline computation that the total offense conduct score will be computed as will your criminal history category score and when those two scores are known, then we're able to look in the sentencing grid table which is contained in the U.S. Sentencing Guidelines. Are you familiar with the Sentencing Guidelines in general terms?
THE DEFENDANT: Yes, I am.

*77 THE COURT: And have your attorneys discussed those Guidelines with you?
THE DEFENDANT: Yes, they have.
THE COURT: And do you understand that until the sentencing hearing, and until any disputes are resolved regarding facts or law, that no one can say for sure what your Sentencing Guideline range will be?
THE DEFENDANT: Yes.
THE COURT: Now, do you understand that there are certain stipulations that are part of your plea agreement and they're attached in Schedule A to the plea agreement?
THE DEFENDANT: Yes.
THE COURT: And do you have Schedule A in front of you?
THE DEFENDANT: Yes, it is.
THE COURT: Have you gone over these stipulations with your attorneys?
THE DEFENDANT: Yes, I have.
THE COURT: And do you understand them?
THE DEFENDANT: Yes, I do.
THE COURT: Do you understand that you and the U.S. Attorney have agreed to be bound by these five paragraphs of stipulations?
THE DEFENDANT: Yes.
THE COURT: And that means that neither you nor the U.S. Attorney may argue something contrary to me at the time of your sentencing. You are free and so is the U.S. Attorney to take positions as to other matters, but not as to those matters that are stipulated in here. Do you understand that?
THE DEFENDANT: Yes, I do.
THE COURT: Now, neither the Probation Department nor the Court is bound by any stipulation in your plea agreement; are you aware of that?
THE DEFENDANT: Yes, I am.
THE COURT: That means that if I find that the actual facts are different from what you stipulated to or that the law must be applied differently from what you stipulated to, then I can disregard any or all stipulations and sentence you in accordance with the facts as I find them to be and the law as I find it to be; do, you understand that?
THE DEFENDANT: Yes, I do.
THE COURT: Now, all parties have an opportunity to be heard at sentencing, and to be heard as [to] any dispute that affects the guidelines or the sentencing. And after I've resolved any such disputes, then for the first time I'm in a position ... to determine what your actual sentence should be; do you understand that?
THE DEFENDANT: Yes, I do.
THE COURT: Do you understand that you'll not be permitted to withdraw your plea of guilty on the grounds that the sentencing guideline range turns out to be different from what you hoped for or anticipated?
THE DEFENDANT: Yes, I do.
THE COURT: Do you also understand that you will not be permitted to withdraw your plea of guilty on the ground that the actual sentence imposed by the Court comes out to be different from what you hoped for or anticipated?
THE DEFENDANT: Yes, I do.
THE COURT: And do you have any questions about sentencing?
THE DEFENDANT: No, I don't.
THE COURT: And if you plead guilty today, then your sentencing will be scheduled for approximately 90 days from now and you would, you know, return to this courtroom at that time.
Now, do you understand that any plea of guilty even to a misdemeanor *78 may have collateral consequences that I haven't mentioned. Those can include consequences to your professional licensing or to other aspects of your personal and professional life; do you understand that?
THE DEFENDANT: Yes, I do.
THE COURT: And have you discussed those consequences and others with your attorneys?
THE DEFENDANT: Yes, we have.
THE COURT: Now, finally, before I can accept a plea of guilty, I have to determine whether there's a factual basis for pleading guilty. And there have been certain questions proposed by the U.S. Attorney. Now, have you gone over a list of questions with your attorneys, Mr. Alampi?
THE DEFENDANT: Yes.
THE COURT: And are there any changes to any of these questions, Mr. Pollack?
MR. POLLACK: No, your Honor.
THE COURT: Is there any reason I should not ask the defendant the following questions?
MR. WEIR: No, your Honor.
THE COURT: All right. Then I'll ask these questions in order to determine whether there is a factual basis for accepting this plea.
First, did you provide accounting services to John Kelly, Michael Gentile and their medical practice, Family Care Medicenter, which is located in Bloomfield, New Jersey?
THE DEFENDANT: Yes, I did.
THE COURT: Did you know that the practice had an operating account?
THE DEFENDANT: Yes, I did.
THE COURT: Was all of the income received by Kelly, Gentile and their partnership to have been deposited into the operating account?
THE DEFENDANT: Yes.
THE COURT: Did you instruct them to deposit all of their income from the practice into an operating account?
THE DEFENDANT: Yes, I did.
THE COURT: At some time during 1991 to 1993, did an employee of Family Care Medicenter tell you that there were checks missing that were to have been deposited into the operating account?
THE DEFENDANT: Yes.
THE COURT: Did the employee ask you to speak to the doctors regarding the missing checks?
THE DEFENDANT: Yes.
THE COURT: Did you then confront Dr. Gentile about the missing checks?
THE DEFENDANT: Yes.
THE COURT: Did he tell you in substance to ignore the employee's statements about these checks?
THE DEFENDANT: Yes.
THE COURT: Did the employee later tell you that additional deposits were missing?
THE DEFENDANT: Yes.
THE COURT: Did you understand her to mean that certain earnings of the partnership were not being deposited into the operating accounts?
THE DEFENDANT: Yes.
THE COURT: Did the employee also tell you that the operating accounts were overdrawn?
THE DEFENDANT: Yes.
THE COURT: Did the employee again ask to speak I'm sorry. Did the employee again ask you to speak with the doctors?
THE DEFENDANT: Yes.
*79 THE COURT: Do you remember the name of that employee?
THE DEFENDANT: Yes.
THE COURT: And what was her name?
THE DEFENDANT: Marie Pulio.
THE COURT: Did you confront Dr. Kelly and Dr. Gentile about this?
THE DEFENDANT: Yes.
THE COURT: Did they fail to provide you with any explanation for the missing deposits?
THE DEFENDANT: Yes.
THE COURT: In or about July of 1995 did Dr. Kelly and Dr. Gentile tell you that they were in trouble with the IRS for a bank account that was missing from their tax returns?

THE DEFENDANT: Yes.
THE COURT: Did they say that they would need you to say that you made a mistake?
THE DEFENDANT: Yes.
THE COURT: Was it your understanding from your conversation with them that they wanted you to say that, that you had made a mistake even if you had not?
THE DEFENDANT: Yes.
THE COURT: Later that same day, in or about July of 1995, were you interviewed by the IRS?

THE DEFENDANT: Yes.
THE COURT: Did you fail to inform the IRS about the fact that the doctors wanted you to say that you made a mistake when you believed that you had not?
THE DEFENDANT: Yes, I did.
THE COURT: Am I correct that you believed that you had not made a mistake?
THE DEFENDANT: I didn't. I thought I was protecting my interests and everybody else's. I thought that was my duty at the time.
THE COURT: Did you also fail to inform the IRS about the information you possessed about missing checks and deposits related to the medical partnership?
THE DEFENDANT: I'm sorry.
THE COURT: Yes, did you fail to inform the Internal Revenue Service about the information you possessed about missing checks and deposits related to the medical partnership?
THE DEFENDANT: Yes.
THE COURT: In doing so, did you assist Dr. Kelly and Dr. Gentile in their failure to supply information to the IRS as they were required to do under law?
THE DEFENDANT: Yes, I did.
THE COURT: Did you do so knowingly and willfully, that is, voluntarily and with the knowledge that by not disclosing the information that you had received you willfully assisted Dr. Kelly and Dr. Gentile in their failure to provide information required by law?
THE DEFENDANT: Yes.
THE COURT: Are you now aware that checks were diverted by Kelly and Gentile to another account that was established at People's Bank?
THE DEFENDANT: Yes.
THE COURT: Should those checks have been deposited into the operating account and should those funds have been reported as income on the tax returns of Gentile, Kelly and their partnership?
THE DEFENDANT: Yes.
THE COURT: Did Dr. Gentile and Dr. Kelly fail to provide you with any information regarding the People's Bank account? *80 THE DEFENDANT: Yes.
THE COURT: And, Mr. Pollack, if this case had gone to trial was the government prepared to prove each of the necessary elements, beyond a reasonable doubt?
MR. POLLOCK: Yes, your Honor.
THE COURT: And, Mr. Alampi, do you still wish to plead guilty?
THE DEFENDANT: Yes, I do.
THE COURT: Mr. Weir, do you believe that these answers establish a factual basis for my accepting your client's plea of guilty?
MR. WEIR: Yes, I do your Honor.
THE COURT: Are there any other questions or clarifications that either Mr. Weir or Mr. Pollack would have me ask at this time?
MR. WEIR: There are none on my part.
MR. POLLACK: None, your Honor.
THE COURT: Mr. Pollack, do you believe also that there's a factual basis?
MR. POLLACK: Yes, I do, your Honor.
THE COURT: And does either attorney know of any reason why I should not accept the plea of guilty at this time under Rule 11?
MR. WEIR: No, I do not, your Honor.
MR. POLLACK: No, your Honor.
THE COURT: Okay, very well. Then, Mr. Alampi, I am going to accept your plea of guilty to the charge in the criminal information. I'll direct the Clerk to enter a disposition of guilty as to that charge and we'll set your case for sentencing for Friday, October 2ndno, I'm sorry, Friday, November 6th at 9:30 a.m.