64 A.3d 1012

JENNIFER WINSTOCK AND RICHARD WINSTOCK, PLAINTIFFS–APPELLANTS, v. AMATO GALASSO, ESQ., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 11, 2012—Decided May 6, 2013.

Before Judges FUENTES, GRAVES, and HARRIS.

*Gabriel H. Halpern* argued the cause for appellants (*Pinilis & Halpern, LLP,* attorneys; *Jeffrey S. Mandel* and *Mr. Halpern,* of counsel and on the briefs).

*Robert B. Hille* argued the cause for respondent (*McElroy, Deutsch, Mulvaney & Carpenter, LLP,* attorneys; *Mr. Hille,* of counsel and on the brief; *John W. Kaveney,* on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

In this legal malpractice case, the Law Division granted defendant attorney Amato Galasso's summary judgment motion, dismissing plaintiffs Jennifer and Richard Winstock's (wife and husband) complaint as a matter of law.

We frame the issues raised by plaintiffs in this appeal in the form of the following questions: (1) can Richard Winstock, a former Roxbury police officer, sue defendant for incorrect legal advice that Winstock claims resulted in his conviction, by way of a plea agreement with the State, for third degree promotion of gambling in violation of *N.J.S.A.* 2C:37–2a(2); and (2) can Jennifer Winstock, the legal owner and registered agent for the limited

liability corporation that operated and promoted the gambling enterprise, sue defendant based on the same theory of liability, despite the State consenting to her admission into the Pretrial Intervention Program (PTI), *N.J.S.A.* 2C:43–12, as part of a global plea agreement involving all those indicted for these offenses, including her husband?

Relying on *Alampi v. Russo,* 345 *N.J.Super.* 360, 367, 785 *A.*2d 65 (App.Div.2001), the trial judge granted defendant's summary judgment motion, holding that plaintiffs' "thesis for recovery undermine[d] the public policy expressed by the doctrine of judicial estoppel." The motion judge also dismissed plaintiffs' claim for emotional distress damages raised as part of this legal malpractice action, because plaintiffs had not presented expert testimony to support this form of relief. *Gautam v. De Luca,* 215 *N.J.Super.* 388, 399, 521 *A.*2d 1343 (App.Div.), *certif. denied,* 109 *N.J.* 39, 532 *A.*2d 1107 (1987).

Plaintiffs now argue on appeal that the trial judge erred in relying on *Alampi* to dismiss their complaint. Plaintiffs argue that, unlike the facts in *Alampi,* in which the plaintiff retained the defendant attorney after the plaintiff had already engaged in criminal conduct, plaintiffs here retained defendant to ensure that their business model was proper and lawful. Thus, according to plaintiffs, but for defendant's incorrect legal advice, they would not have engaged in the conduct that gave rise to the criminal charges. Plaintiffs also argue that the trial court should not have dismissed their claim for emotional distress damages pursuant to *Gautam* because, under these circumstances, an expert is not necessary.

■ Because the trial court dismissed plaintiffs' causes of action as a matter of law, our standard of review requires us to consider all factual allegations in the light most favorable to plaintiffs. The "essence of the inquiry" is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 536, 666 *A.*2d

146 (1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 251–52, 106 *S.Ct.* 2505, 2512, 91 *L.Ed.*2d 202, 214 (1986)); *see also R.* 4:46–2(c). In the process of making this determination, " 'we are not required to accept, as competent evidence, a purely self-serving certification by [a] plaintiff that directly contradicts his [or her] prior representations in an effort to create an issue of fact, which his [or her] previous testimony had eliminated.' " *Alfano v. Schaud,* 429 *N.J.Super.* 469, 475, 60 *A.*3d 501 (2013) (quoting *Shelcusky v. Garjulio,* 343 *N.J.Super.* 504, 510, 778 *A.*2d 1176 (App.Div.2001), *rev'd on other grounds,* 172 *N.J.* 185, 797 *A.*2d 138 (2002)).

■ After carefully reviewing the record before us, and mindful of our standard of review, we reverse the order dismissing plaintiffs' legal malpractice action. The material factual issues disputed in this case preclude a strict application of the principles we endorsed in *Alampi.* Unlike in *Alampi,* a rational jury in this case could find that defendant's role as a legal advisor was a substantial factor that led plaintiffs to engage in criminal conduct. The trial court also misapplied *Alampi* by treating Richard Winstock's guilty plea as creating an impenetrable wall, shielding defendant from civil liability based on professional malpractice. In cases involving tort or contract claims, the doctrine of issue preclusion does not automatically prevent a plaintiff in a civil trial from contesting the admitted facts that formed the basis of his or her guilty plea. *State, Dep't of Law and Pub. Safety v. Gonzalez,* 142 *N.J.* 618, 629, 667 *A.*2d 684 (1995) (citing *Eaton v. Eaton,* 119 *N.J.* 628, 643, 575 *A.*2d 858 (1990)).

As to Jennifer Winstock, her case against defendant is unencumbered by the concerns associated with her husband's criminal conviction. Admission into PTI is not predicated upon an accused acknowledging his or her culpability to a particular corresponding criminal charge. *Guideline* IV, *R.* 3:28. Furthermore, once admitted into supervisory treatment, as was the case here with Jennifer Winstock, any "statement or disclosure" made by a participant in a PTI program is not admissible evidence against

her "in *any* civil or criminal proceeding." *N.J.S.A.* 2C:43–13f (emphasis added).

We affirm, however, the motion judge's dismissal of plaintiffs' claim for emotional distress damages. We discern no legal basis to deviate from our holding in *Gautam* prohibiting the recovery of such damages in legal malpractice cases.

I

A

Richard Winstock began working as a police officer for the Township of Roxbury in 1993. He was promoted to the supervisory rank of Sergeant in 2001. In the fall of 2003, Roxbury Police Chief Mark Noll learned that Sergeant Winstock and fellow Roxbury police officer Thomas Juskus were "running poker tournaments at a firehouse at Port Morris," a section of the Township of Roxbury. Chief Noll testified before the grand jury that indicted plaintiffs [1] that he "ordered" both officers "not to be involved with anything to do with organizing poker tournaments." Around the same time this was taking place, Lieutenant James Simonetti informed Chief Noll that Sergeant Winstock and Officer Juskus were involved in another poker tournament taking place in a building occupied by the Knights of Columbus in the Borough of Netcong. Chief Noll ordered Winstock and Juskus to also avoid any contacts with this gambling activity.

---

[1] On August 30, 2005, the Morris County grand jury hearing the case indicted Richard Winstock on two counts of second degree official misconduct, *N.J.S.A.* 2C:30–2; four counts of fourth degree maintaining a gambling resort, *N.J.S.A.* 2C:37–4b; three counts of third degree perjury, *N.J.S.A.* 2C:28–1; and one count of second degree conspiracy to maintain a gambling resort, official misconduct, and perjury, *N.J.S.A.* 2C:5–2. The grand jury indicted Jennifer Winstock on one count of second degree conspiracy, *N.J.S.A.* 2C:5–2; three counts of third degree perjury, *N.J.S.A.* 2C:28–1; two counts of fourth degree maintaining a gambling resort, *N.J.S.A.* 2C:37–4b; and one count of second degree facilitating the commission of official misconduct; *N.J.S.A.* 2C:30–2.

At his deposition in connection with his legal malpractice action, Richard Winstock testified that the "poker tournaments" at the firehouse and the Knights of Columbus were restricted at first to his friends and acquaintances. However, the tournaments quickly grew to involve "at [their] height" as many as one hundred players. The tournaments were held at the Knights of Columbus in Netcong when the number of players grew to this level; the firehouse in Roxbury was not large enough to accommodate this many people.

As Richard Winstock explained at his deposition, the tournaments were arranged to award the top ten "participants" a percentage "of the total money put in at the start of the tournament." Thus, assuming a particular tournament had one hundred players, the top ten "would get something ... [a]nd the other 90 percent would get nothing." At first, the tournaments were organized by Richard Winstock, Juskus, and a friend of Winstock named Tom Valienti. The three of them "collectively" provided the cards and chips for the poker games and awarded the top ten winners shirts and hats in addition to their winnings.

According to Richard Winstock, the first time he met defendant was at a poker tournament that defendant "was running" in a VFW "east of Roxbury." He went to the tournament only to play cards and did not discuss his idea of starting his own club with defendant at that time. He raised the issue of a club with defendant months after the tournament, when he called defendant "[t]o ask his legal advice on the legality of the operation." According to Mr. Winstock, he told defendant on the phone that he, Juskus, and Valienti "were looking to open up an establishment where [they] would go and [they] wanted to charge an hourly rate to be in the establishment and if it would be okay if [they] played cards in the establishment." When defense counsel asked Winstock whether he described to defendant "the other recreation activities that [he] intended to be there at the time," Winstock answered: "No."

Mr. Winstock testified that, based on his training and experience as a police officer, he had some understanding about the legality of gambling activities codified in Title 2C before he called defendant to solicit his advice. Winstock summarized his understanding of this area of the law as follows:

> In the law enforcement community they call it a golden rule, it is basically, the house cannot make any money. They cannot take what's called a [d]ig and they cannot rake,[2] which you referred to earlier.
>
> My understanding was that whatever was put into the game must go out, must be awarded in the game and in the State of New Jersey they term it as you're considered a player of the game so it is legal in the State of New Jersey.
>
> So my interpretation of the statutes are, ten of us play cards at our house, we all put in $100, as one person walks away and any combination of those guys walk away with $1,000 that would be legal under New Jersey statute.
>
> So my understanding, at that time, you know, with my training was that as long as the house wasn't taking profit from the gambling, we were not in violation. *That's exactly why I contacted Amato to verify that.*
>
> [ (Emphasis added).]

Despite this definitive statement concerning the scope of defendant's role at this juncture of his deposition, a few pages later, Mr. Winstock testified that defendant's role went far beyond just providing legal advice:

> A. Mr. Galasso was to oversee the opening of the Fifth Street Club and to make sure it stayed within the boundaries and the guidelines of the statutes. That was his role, to be involved in facilitating its operation.
>
> Q. When you say "operation," you mean the actual operation of the club, he was going to oversee that?
>
> A. Correct.
>
> Q. And you paid him to do that?
>
> A. He was given a retainer to monitor how the club operated.
>
> Q. How much was this retainer?
>
> A. I don't know the specific amount.
>
> Q. When you're talking about monitoring, are you talking about legal work as a lawyer or are you talking about other work other than legal work in terms of the day-to-day operations of the club?
>
> A. *Specifically, Amato said that every piece of paper, every tournament, every bit of the operation would go through him. He wanted to monitor how he was being*

---

2 Later in the deposition Mr. Winstock clarified that "rake" or "dig" meant "taking a cut of the gambling money for the house."

*paid to monitor the operation. I guess from a legal point of view.* Does that answer your question?

Q. He was never considered an employee of the LLC, was he?

A. Are you asking me my interpretation? We had no employees, but, yes, Fifth Street Club hired him to be its attorney.

Q. You retained him but he wasn't on any payroll for Fifth Street Club, was he?

A. I believe he was.

Q. Okay. What's the basis of that?

A. Part of the retainer was that he would be in the club at any time free of charge so in my opinion, he's receiving a monetary fee for being our counsel.

[ (Emphasis added).]

## B

By letter dated July 1, 2004, Sergeant Winstock wrote to Chief Noll seeking leave to work part-time to help his wife who was "starting a business" to be known as "Fifth Street Club LLC"[3] located in a "warehouse" in the Town of Dover. In support of his formal request for "off-duty employment approval," Sergeant Winstock described the work he intended to do for his wife as follows:

An abundance of construction work will be required to successfully make the location habitable. The request contained within will be to perform all construction work, to include: carpentry, plumbing, electrical, sheetrock, painting, heating/air conditioning, and/or all work necessary to pass Township [sic] [4] of Dover inspections.

Once the business is open, I will also be maintaining the premise to include all janitorial work and maintenance of the establishment and equipment on site.

Fifth Street Club LLC (Private Social Club) will be a[sic] 8000 sq/ft facility that will offer a variety of adult recreational activities, To [sic] include pool tables, dart boards, air hockey tables, T.V. lounge area, kitchen area, ping pong table area,

---

[3] The Certificate of Formation issued by the New Jersey Department of Taxation, Division of Revenue, Business Gateway Services, legally recognizing "5th Street Club LLC" as a "Social Club" for the purpose of "Dating, etc.," was not issued until July 16, 2004, fifteen days after Richard Winstock's letter. The certificate listed Jennifer Winstock as the registered agent and "authorized representative."

[4] The municipality of Dover in Morris County is actually organized as a Town. *See N.J.S.A.* 40A:62–1. The municipality of Dover in Ocean County is organized as a Township. *See N.J.S.A.* 40A:63–1.

backgammon tables, chess tables, cigar lounge area, card table area, and fuse [sic] ball tables.

Sergeant Winstock indicated in the form used by the Roxbury Police Department that his "off-duty employment" would be terminated on December 31, 2004.[5]

Chief Noll made clear in his testimony before the grand jury that Sergeant Winstock never disclosed to him that he had an ownership interest in the Fifth Street Club or that he had invested thousands of dollars of his own money to launch a business venture that was, in essence, a gambling enterprise. Chief Noll emphasized that he would have denied Winstock's request for off-duty employment if he had known any of these details. Finally, in response to the prosecutor's question, Chief Noll informed the grand jurors that, as a police officer, Sergeant Winstock had a duty to provide him truthful, complete, and accurate information.

## C

On August 11, 2004, Sergeant Winstock and defendant appeared before the Dover Zoning Board of Adjustment to obtain a zoning approval to operate the Fifth Street Club.[6] The factual background leading to defendant's presentation of evidence and general prosecution of plaintiffs' application before the Board is hotly contested by the parties. In a certification submitted in opposition to defendant's motion for summary judgment, Richard Winstock averred that defendant choreographed the entire event, including preparing

a script of [Winstock's] testimony (a sheet of questions and answers) in which [defendant] specifically directed [him] to downplay the fact that poker tournaments

---

[5] Officer Juskus submitted a similar "off-duty employment approval" request, giving the same description of the work he expected to do to assist his "friend Jennifer Winstock." Juskus indicated that it was "unknown" when the work would end.

[6] The application required a use variance, because the property where the club was located was not zoned for recreational uses.

would be held at the facility, and to emphasize, during the meeting, all of the different activities that were available to members of the club.

By contrast, in his statement of material facts, defendant maintained that Richard Winstock's testimony before the Board was entirely of his own volition and was not influenced or directed by defendant. Specifically, in the course of presenting evidence before the Board, defendant asked Winstock opened-ended questions for the purpose of describing the club's activities to both the Board and members of the public in attendance. According to defendant, in response to these questions, Mr. Winstock stated that the club would be

"an amusement and recreation center for adults," ... [with] a "large variety" of activities including billiards, backgammon, chess, monopoly, shuffle board, horse shoes, bridge, gin rummy, pinochle, *poker*,[7] spades, darts, fuze [sic] ball, radio controlled race cars, batting cages, golf driving range, pinball, climbing walls, computer center, arcade, etc.

[ (Emphasis added).]

We note from our own review of the record that when defendant asked Mr. Winstock to tell the Board "some of the reasons why members join the club," Mr. Winstock gave the following response:

I think that light minded [sic] term pretty [much] [en]compasses most of it. But, um, in the past it's been an excellent opportunity for networking amongst the professionals to include. Like I said earlier, "Doctors, lawyers, police officers."

It's been more of a relaxation type of after-hours type of place of congregation for lack of a better term.

Defendant's presentation also included the testimony of John Williams Hill, the owner of the property where the club would be located.[8] Because Mr. Hill was also a professional engineer, the Board admitted him to testify in this capacity and give his opinion

---

[7] Our own review of the transcript of the Board of Adjustment meeting held on August 11 2004, revealed that this oblique, fleeting reference to "poker," included in a list of five card games, was the only time this word was mentioned at the meeting. The words "gambling" and/or "tournament" were not uttered by anyone connected with the application at any time.

[8] Defendant also represented plaintiffs in negotiating the terms of the club's lease with Mr. Hill.

concerning the technical details of the site plan and relevant building codes.

By oral vote of the members present, the Board approved plaintiffs' application at that same meeting. The Board adopted a memorializing resolution on September 8, 2004. Paragraph 7 of the approval resolution specifically described the Board's understanding of the nature of the club's activities:

> The club would have four (4) to six (6) employees. No alcoholic beverages would be served or permitted on the premises. No cooking would be performed and the only food would be snack foods, juices and soft drinks. The activities participated in by club members would include billiards, board games, card games, darts, bocce, pinball machines, slot cars, and rock climbing. The club would construct or install within its space billiard tables, pinball machines, computers with internet access, a bocce court, rock climbing walls, lounge furniture and conversation areas. The membership would be private and limited to individuals who are at least 21 years of age. No music, loud speakers or dancing would be permitted. There are no shower or locker room facilities on the premises were [sic] proposed.

### D

According to Mr. Winstock, Chief Noll was "fully aware of [his] participation and involvement in the 5th Street Club LLC." At his deposition, Mr. Winstock testified at length about keeping Chief Noll "in the loop" concerning all of the details of the club, both the construction phase "and the general philosophy behind the club." According to Mr. Winstock:

A. Yes, Chief Noll understood the setup of the operation. The actual company was in my wife's name, so prior to opening we have had tons of conversations with him and I about the legality of the club. So it was completely explained to him as well as all my other supervisors how Mr. Galasso advised us that we could go forward with the operation.

Q. I'm sorry. That wasn't my question. My question was, you made a request for off duty employment and told [Chief Noll] that you were only going to be doing construction.

A. Correct.

Q. And what I'm asking is, after this date, with regard to your role in the club, did you ever tell [Chief Noll] that you were going to be doing something else with regard to the operations of the club or have any involvement in the club?

A. Yes. He knew I was going to be a member of the club. He knew we'd be playing cards at the club. He knew we were at the club. He knew what was going on at the club. He was kept apprized completely.

> Q. When you say, "he knew what was going on at the club," what do you mean?
>
> A. The operation. He knew that cards were being played at the club. He knew that there was gambling at the club.

Mr. Winstock also emphasized this point in his counter-statement of material facts submitted in opposition to defendant's summary judgment motion. He averred that, in addition to his own review of the gambling statutes, the *"Chief, [his] Lieutenant, and [he] had numerous and virtually daily discussions regarding the legality of the 5th Street* Club." (Emphasis added).

We acknowledge that this concern over the "legality of the club" stands in stark contrast to the innocuous activities Mr. Winstock described in his testimony before the Board of Adjustment. The Board's own findings reflected in paragraph 7 of the approval resolution indicate the Board's acceptance of Mr. Winstock's credibility on this issue. The question of which version is more plausible or believable, however, is not susceptible to summary disposition. *See Brill, supra,* 142 *N.J.* at 543, 666 *A.2d* 146.

There came a point, according to Mr. Winstock, that Chief Noll requested that defendant provide him (Winstock) "with a written memorandum confirming the legality of the club which could be presented to the prosecutor's office." At Mr. Winstock's request, defendant prepared a "Confidential Memorandum" dated November 23, 2004, addressed to the "Owners of 5th Street Club, LLC." In the interest of clarity, and given the singular importance of this memorandum to plaintiffs' cause of action, we recite the contents of this document at length:

*Introduction*

The prosecutor's office has requested an opinion regarding the legality of the operation and activities conducted at 5th Street Club, LLC (hereinafter "The Club") located ... [in] Dover, New Jersey. The important factors to consider in reaching this determination are the structure of the organization, the various types of activities that are offered and the method by which the Club is funded.

The 5th Street Club, LLC is a limited liability company formed under the laws of the State of New Jersey. The Club is a recreation center offering amusement and social activities to members over the age of 21 years. The different activities include: Air Hockey, Billiards, Bridge, Chess, Cigar/Smoking Lounge, Darts, Foosball, Gin Rummy, Ping Pong, Pinochle, Poker, and Television lounge.

During the time spent at the Club, members are permitted to use any of the facilities at no charge. This also includes free refreshments, such as soda, bottled water, coffee, light snacks, etc.

The Club charges monthly, daily or hourly dues to its members for use of the facilities based upon the member's individual preference. The Club anticipates that some of its members will attend the Club infrequently while others may attend almost every day. Members who pay dues on a monthly basis will be allowed to use any of the facilities anytime the Club is open, which at the current time is Thursday and Friday, 4:00 PM to 1:00 AM, Saturday 12:00 PM to 1:00 AM, and Sunday 12:00 PM to 9:00 PM. The members who pay on a daily basis will be permitted to use the facilities from the time they arrive until closing that evening. The members who opt for hourly dues are clocked in and out from the moment they arrive and leave the premises and charged accordingly.

The question has arisen as to whether or not the Club is operating in violation of New Jersey Law if a member chooses to wager on the outcome of Club activities. Unfortunately, no New Jersey Court has directly addressed this issue. Accordingly, this opinion memorandum is based solely up [sic] my review of applicable statutes and my anticipation as to the manner in which a New Jersey Court likely would decide the issue. Based upon my review of the current laws in New Jersey, my interpretation is that the activities carried out at the 5th Street Club do not violate the law, because the Club is not acting as a gambling resort. Members are permitted to enjoy any of the activities offered at the Club. If members, at their option, wish to wager on the outcome, they are permitted to do so, provided there is no one, including the Club, acting as a bookmaker, which is in violation of the law.

Since my client does not profit or receive remuneration for any bet or wager, which may be set by the individual members, my client is not in violation of the gaming statutes. It should be further noted that many members would also play the particular games or activities without betting or wagering on the outcome.

This type of establishment is similar to Dave and Busters, a popular chain of restaurant/bars, where adults can spend a few hours socializing and playing games. The difference between the two is that Dave and Busters is more of an arcade that also offers drinking, dining and games on an "a la carte" basis.

The Club may also be favorably compared to a pool hall. Patrons play at the pool tables for a cost. Some of the patrons may place wagers on the outcome of the game and some just play for fun.

Another similar establishment is a country club, where dues paying members of the club are afforded access to the services that the club has to offer. I am sure you can visit almost any country club and find a card game being played on any given day of the week. The members playing are more than likely wagering on the outcome of the game being played, whether it is for a cup of coffee or for cash. Many members also regularly wager on outcome of the golf games. The country club is not profiting directly form the members playing these games. I am unaware of a country club or private social club at which members took it upon themselves to wager on a card game being treated as a gambling resort, unless the hosting organization was profiting directly from the gambling.

Since the passage of *N.J.S.A.* 2C:37–1 et seq. in the 1970's, it has not been illegal to set up a card game in New Jersey and place wagers on the outcome. The law does not limit the size of the game[s] being played, but instead provides only that the organizer, or anyone else, may not receive any remuneration directly from the gambling.

In addition, according to my interpretation of New Jersey's gambling laws, if all the players are on an equal footing (meaning no one player has a statistical edge over another) it is legal to place a wager on the outcome of a result. This does include any player who would not be at risk and would still be obtaining a financial gain for the gambling involved. I qualify my client from this definition as it charges members for their time at the Club, whether spent socializing, wagering, or just playing for fun and bragging rights.

In summary, it is my opinion based upon my review of existing New Jersey law, that if 5th Street Club, LLC operates their establishment in the manner in which it was described to me, the Club is not in violation of New Jersey Law and should be permitted to continue operating its business venture.

If there is any New Jersey precedent or statute of which I am unaware which requires a different conclusion, I would appreciate it if you would bring it to my attention, so that I may reconsider the presumptions and conclusions of this memorandum.

The parties agree that, after receiving this legal memorandum from defendant, Mr. Winstock spoke to a "PBA attorney" who at the time was representing Officer Juskus, concerning the legality of the club. In a letter dated January 4, 2005, addressed to Officer Juskus, this attorney was "candidly" critical of both the substance and scope of analysis of defendant's memorandum. This attorney concluded the letter to Officer Juskus as follows:

I remain concerned that Mr. Galasso's first draft of his Letter Memorandum, which for whatever reason was addressed to the Morris County Prosecutor's Office,[9] does not sufficiently address the legal issues involved in this business venture. Again, I also remain concerned with any involvement whatsoever of law enforcement officers in such an enterprise.

In his deposition testimony and in his statement of material facts in opposition to defendant's motion for summary judgment, Mr. Winstock denied that he received any legal advice from this

___

9 The opinion memorandum authored by defendant included in the record before us is dated November 23, 2004, and clearly labeled "**CONFIDENTIAL MEMORANDUM**" and is addressed to "Owners of 5th Street Club, LLC." The attorney's reference to the Prosecutor's Office may involve the Memorandum's introduction, which began, "The prosecutor's office has requested an opinion."

attorney concerning the legality of the club. Although he spoke to this lawyer concerning this topic, the only information Mr. Winstock received from him was a referral to an attorney associated with a large, well-known New Jersey firm, which the PBA attorney described as experienced in such matters.

### E

Sometime in January 2005, the Morris County Prosecutor's Office began investigating the Fifth Street Club for alleged illegal gambling activities. Undercover agents from the prosecutor's office visited the club on several occasions and were able to record conversations with Richard Winstock in which he made a number of ostensibly incriminating statements about the dubious legal status of the club's operations. In a conversation covertly recorded on April 24, 2005, Richard Winstock boasted to an undercover investigator from the prosecutor's office that he had found a way to operate the club's gambling activities and promotions within the law:

[RICHARD WINSTOCK]: So, I ... with this guy ... who ran his own tournament and I said to him, I went over these laws, and I have the law here, and I went over them, and over them, and over them.... [T]here's no doubt in my mind, or any lawyer's mind that I talked to, or the Prosecutor's Office, or my chief, that the way we're doing it is a loophole in the law. I've been told as high as the ACJ, the Attorney General—that we found a loophole in the law.

[UNDERCOVER AGENT]: Perfect.

[RICHARD WINSTOCK]: The way the law was written, it was written for a home game. In other words, you can have 10 guys at your house and play cards.

[UNDERCOVER AGENT]: Yeah.

[RICHARD WINSTOCK]: It boils down to—As long as they're not taking any money out of the pot or the gambling proceeds....

. . . .

[RICHARD WINSTOCK]: [It is all] [p]erfectly legal. Not a thing illegal about it. So we took this a step further and said, that's one table and the house is okay, but what if we have 10 tables and we do the same concept.

The prosecutor's investigation also revealed that the club was operating in violation of certain explicit restrictions imposed by the Dover Zoning Board of Adjustment. For instance, the club was open on Monday nights to permit non-members to enter and

participate in the activities offered, which consisted primarily of poker tournaments conducted and promoted with great frequency. Additionally, numerous activities described in defendant's legal opinion memorandum as offered by the club to its members were not actually available on the premises.

## II

On April 29, 2005, at the end of his shift, Sergeant Winstock was arrested and suspended from duty as a Roxbury police officer. The day after his arrest, Sergeant Winstock was formally interrogated by investigators assigned to the Professional Standards Unit of the Morris County Prosecutor's Office. He told the investigators he was aware the club was operating "in a gray area." However, he continued: "[E]very attorney I've spoken to, uh, has said basically the same thing, that they don't see a violation, but it's a very gray area."

On August 30, 2005, Richard and Jennifer Winstock were indicted on multiple counts of perjury and illegal gambling, including maintaining a gambling resort.[10] On September 5, 2007, plaintiffs entered negotiated, global plea agreements with the State through which every count against every defendant named in the indictment was resolved by either an admission of guilt, admission into a diversionary program, or dismissal.

With respect to Jennifer Winstock, the State consented to her admission into PTI. Richard Winstock pleaded guilty to fourth degree maintenance of a gambling resort for participating in the proceeds of gambling activities, contrary to *N.J.S.A.* 2C:37-4(a), and third degree promoting gambling, contrary to *N.J.S.A.* 2C:37-2(a)(2) and (b)(2). At the plea hearing, Richard Winstock's attorney asked him a series of questions to establish a factual basis for his guilty plea pursuant to *Rule* 3:9-2. All of the following statements and admissions by Richard Winstock were thus made

---

[10] The grand jury also indicted Officer Juskus, Scott K. Furer, Robin Furer, and Richard Wagner.

under oath and with the express purpose of inducing the Criminal Part judge to accept his answers as a voluntary and truthful declaration of guilt:

> Q. As to Count 13, retaining a gambling resort in the fourth degree, on or about November 19th, 2004, to April 30, 2005, in the Town of Dover, in the County of Morris, were you—did you have authoritative control over what's commonly known as Fifth Street?
>
> A. Yes.
>
> Q. And Fifth Street was an establishment that was set up for the purpose of having Texas Hold 'Em and other poker games, as well as other games?
>
> A. Yes.
>
> Q. And the purpose of that—and you did supply Fifth Street the chips and the cards and the location?
>
> A. Yes.
>
> Q. And you did that for financial gain; did you not?
>
> A. Yes.
>
> Q. And there was gambling activity on the premises which was the Texas Hold 'Em?
>
> A. Yes.
>
>    . . . .
>
> Q. On the same date and—same dates in question, the same place . . . [d]id you actually receive in a given day from the hourly fees that were charged at least a hundred dollars on a given day for those hourly fees?
>
> A. Yes.
>
> Q. And that was from the Texas Hold 'Em or other—other gambling games or poker games that was being played?
>
> A. The hourly fees, yes.

Although the court did not address Mr. Winstock directly on this issue, the assistant prosecutor assigned to the case made clear at the plea hearing that, although the State would not oppose a probationary sentence, the State would nevertheless argue at the time of sentencing for the court to impose a term of up to 364 days of incarceration in the Morris County Jail as a condition of probation. By pleading guilty, Mr. Winstock also forfeited his public office as a Roxbury police officer as a matter of law.

Before the court imposed sentence, Mr. Winstock moved to vacate his guilty plea. Mr. Winstock submitted a certification in support of his motion that alleged, inter alia, that: (1) he was coerced into pleading guilty by his criminal trial attorney; (2) his

codefendant wife told him that unless he accepted the plea agreement, she would leave him and take their three children to North Carolina to live with her parents; [11] (3) he was unaware that defendant Galasso testified before the grand jury because "the [grand jury] transcript was provided to [his] attorney merely days before [his] trial date"; and (4) he was falsely told that his codefendant wife's nursing license would not be negatively affected by her admission into PTI.

The Criminal Part conducted an evidentiary hearing to consider the motion. Mr. Winstock was the only witness to testify. For reasons not disclosed in the record before us, plea counsel was not called as a witness. The Criminal Part denied Mr. Winstock's motion to vacate his guilty plea. We affirmed on direct appeal. *State v. Winstock,* Docket No. A–1212–07, 2008 *WL* 4722636 (App.Div. Oct. 29, 2008), *certif. denied,* 197 *N.J.* 476, 963 *A.*2d 845 (2009).[12]

### III

Plaintiffs filed a legal malpractice complaint against defendant on April 30, 2007. After joinder of issue and engaging in extensive discovery that included interrogatories, depositions, and the exchange and production of numerous documents, defendant moved for summary judgment, relying on a statement of material facts that contained eighty-five numbered paragraphs. Plaintiffs denied many material allegations raised by defendant and provided additional allegations or contentions.

After hearing the arguments of counsel, the motion judge issued an oral opinion granting defendant's motion for summary judg-

---

[11] Mr. Winstock admitted, however, that he never revealed this alleged threat to anyone, including his defense counsel.

[12] The certification submitted by Mr. Winstock in support of his motion to vacate his guilty plea contained additional allegations which we do not recite here. Mrs. Winstock also submitted a certification corroborating the allegations concerning the removal of the children and other matters.

ment. Although the judge recounted at length the convoluted facts of this case, his basis for dismissing plaintiffs' case was entirely predicated on his understanding of our holding in *Alampi, supra*. It is thus essential that we recite the facts and discuss the legal principles that guided our decision in *Alampi*.

In *Alampi*, the plaintiff was a licensed public accountant who provided accounting services to two physicians who established a medical practice. 345 *N.J.Super.* at 362, 785 *A.*2d 65. Between 1991 and 1994, an employee of the medical practice informed the plaintiff of an apparent diversion of revenue generated by the family practice. *Ibid.* Specifically, checks payable to the medical practice were not being deposited in the business's account. *Ibid.* When the plaintiff brought these improprieties to the attention of one of the physicians, he was told to "ignore" the matter. *Ibid.* When additional allegations concerning missing checks from the practice's operating account resurfaced, both physicians failed to give the plaintiff any information about this situation. *Ibid.*

In July 1995, the two physicians told the plaintiff that "they were being investigated" by the Internal Revenue Service (IRS). *Ibid.* The attorneys representing the physicians advised the plaintiff to retain his own independent counsel. *Ibid.* In August 1995, the plaintiff retained the defendant, attorney Albert Russo. *Ibid.* The plaintiff and Russo met with the IRS. *Ibid.* Russo advised the plaintiff "not to answer any questions." *Ibid.*

Three months after this meeting with the IRS, Russo and the attorneys representing the two physicians asked to sign a joint defense agreement and affidavit stating the plaintiff "had made mistakes in preparing the taxes" for the two doctors and the medical practice. *Ibid.* The plaintiff refused to sign these documents. *Ibid.* A month later, Russo sent the plaintiff a letter "memorializing" his advice. *Ibid.* Russo told the plaintiff that the IRS was now including the plaintiff in the investigation " 'for potential criminal referral.' " *Id.* at 363, 785 *A.*2d 65.

Russo subsequently advised the plaintiff "not to discuss the case with the IRS without a grant of immunity." *Ibid.* Russo also

reminded the plaintiff that he had the option to cooperate with the IRS, but advised against it. *Ibid.* After Russo suggested that the plaintiff "seek the opinion of other counsel on how to proceed" if he wished, the plaintiff discharged Russo and retained another attorney. *Ibid.*

The plaintiff was thereafter "indicted for violations of 18 *U.S.C.* § 371 (conspiracy to defraud by preparing false and fraudulent tax returns); 26 *U.S.C.* § 7203 (failure to supply information); and 26 *U.S.C.* § 7206(2) (fraud and false statements)." *Ibid.* He pleaded guilty to the misdemeanor offense of failing to supply information with regard to an IRS investigation, in violation of 26 *U.S.C.* § 7203, and was sentenced to a twelve-month term of probation and ordered to pay a $2000 fine. *Ibid.* The two physicians were acquitted. *Ibid.*

We will recite the material facts of the plaintiff's factual basis which our colleagues relied on in reaching their legal conclusion:

THE COURT: ... First, did you provide accounting services to [the two doctors] and their medical practice ... ?

[Alampi]: Yes, I did.

....

THE COURT: In or about July of 1995 did [the two doctors] tell you that they were in trouble with the IRS for a bank account that was missing from their tax returns?

[Alampi]: Yes.

THE COURT: Did they say that they would need you to say that you made a mistake?

[Alampi]: Yes.

THE COURT: Was it your understanding from your conversation with them that they wanted you to say that, that you had made a mistake even if you had not?

[Alampi]: Yes.

THE COURT: Later that same day, in or about July of 1995, were you interviewed by the IRS?

[Alampi]: Yes.

THE COURT: Did you fail to inform the IRS about the fact that the doctors wanted you to say that you made a mistake when you believed that you had not?

[Alampi]: Yes, I did.

THE COURT: Am I correct that you believed that you had not made a mistake?

[Alampi]: I didn't. I thought I was protecting my interests and everybody else's. I thought that was my duty at the time.

. . . .

THE COURT: Yes, did you fail to inform the Internal Revenue Service about the information you possessed about missing checks and deposits related to the medical partnership?

[Alampi]: Yes.

THE COURT: In doing so, did you assist [the two doctors] in their failure to supply information to the IRS as they were required to do under law?

[Alampi]: Yes, I did.

THE COURT: *Did you do so knowingly and willfully, that is, voluntarily and with the knowledge that by not disclosing the information that you had received you willfully assisted [the two doctors] in their failure to provide information required by law?*

[Alampi]: Yes.

[*Id.* at 364–65, 785 *A.*2d 65 (original emphasis omitted) (emphasis added).]

Alampi sued Russo for legal malpractice, contending that Russo "neglected to keep him properly informed about the potential of a criminal investigation proceeding and failed to arrange for a meeting with the IRS in the fall of 1995, where the government could have been persuaded to either grant him transactional immunity or decline to prosecute him." *Id.* at 365, 785 *A.*2d 65. Russo denied that the government ever had any inclination to grant the plaintiff immunity. *Ibid.*

The trial court in *Alampi* granted summary judgment to Russo, finding that "public policy precluded this action." *Id.* at 362, 785 *A.*2d 65. Our colleagues framed the issue on appeal as presenting "the novel question in this jurisdiction: whether an unimpeached guilty plea in a criminal proceeding bars recovery in a legal malpractice action." *Id.* at 368, 785 *A.*2d 65. After canvassing the opinions of the jurisdictions that had addressed similar questions, the panel in *Alampi* held that plaintiff was precluded from taking a position in the legal malpractice action that was inconsistent with the factual basis he gave to induce the criminal court to accept his guilty plea. *Id.* at 368–71, 785 *A.*2d 65. The panel viewed the plaintiff's malpractice action as akin to a collateral attack on his criminal conviction. *Id.* at 366–67, 785 *A.*2d 65.

The *Alampi* court also concluded that the plaintiff's "thesis for recovery undermine[d] the public policy expressed by the doctrine of judicial estoppel." *Id.* at 367, 785 *A.*2d 65. However, the court in *Alampi* declined to require complete exoneration of the criminal charges as an indispensable prerequisite to a viable legal malpractice action. *Id.* at 371, 785 *A.*2d 65.

## IV

We are satisfied that the analysis employed by our colleagues to the facts in *Alampi* is not applicable here. First, as stated above, Jennifer Winstock did not plead guilty to any crime. She was admitted into the PTI program, which provides that "supervisory treatment ... shall be available to a defendant irrespective of whether the defendant contests his [or her] guilt of the charge or charges against him [or her]." *N.J.S.A.* 2C:43–12g; *see also Guideline IV, R.* 3:28 ("Enrollment in PTI programs should be conditioned upon neither informal admission nor entry of a plea of guilty. Enrollment of defendants who maintain their innocence should be permitted unless the defendant's attitude would render pretrial intervention ineffective.").

Here, the prosecutor consented to Jennifer Winstock's admission into PTI. She was not required and did not provide any self-incriminating statement as a condition of her admittance into the PTI program. *See State v. Mosner,* 407 *N.J.Super.* 40, 56, 969 *A.*2d 487 (App.Div.2009). Despite these clear legal distinctions between Jennifer Winstock's status and those of her co-plaintiff husband, the motion judge found as follows:

> While Jennifer Winstock ... may not have given the same allocution that the other three plaintiffs did at the time of their plea, nevertheless, by being permitted to enter PTI, [she] implicitly accepted the consequences of [her] criminal activity. There is no public policy basis for this Court to allow Jennifer Winstock ... to benefit from a plea agreement to enter PTI and then sue the Defendant Galasso for [her] own criminal conduct that [she] chose not to challenge at trial.

The trial court's decision to apply a theory of estoppel against Jennifer Winstock based on her admission into PTI is untenable as a matter of law and undermines the expressed public policy

embodied in the PTI program: to "[p]rovide a mechanism for permitting the least burdensome form of prosecution possible for defendants charged with 'victimless' offenses." *N.J.S.A.* 2C:43–12a(3); *see also N.J.S.A.* 2C:43–13f.

We now address the case brought by Richard Winstock. As our extensive review of the facts underlying our decision in *Alampi* shows, the plaintiff was already involved in criminal activity as an accountant by failing to report to the IRS the unlawful diversion and concealment of income by his clients, before he retained the defendant. *Alampi, supra,* 345 *N.J.Super.* at 364–65, 785 *A.*2d 65. Another significant distinction from the facts here, the colloquy between the plaintiff and the federal judge illustrate that the plaintiff knew he was violating the law before he retained the defendant. *See ibid.*

By contrast, Richard Winstock's allocution established that: (1) he had "authoritative control" over the club; (2) the club "was an establishment that was set up for the purpose of having ... poker games, as well as other games"; (3) he supplied the club with "the chips and the cards and the location"; (4) he did this "for financial gain"; (5) "there was gambling activity on the premises"; (6) the club charged fees to become a member; (7) he received "at least a hundred dollars on a given day for ... hourly fees"; and (8) "gambling games or poker games" were played in the club.

It is undisputed that all of this activity Richard Winstock admitted he engaged in occurred *after he had retained defendant as his legal advisor.* Accepting plaintiffs' version of events in the light most favorable to them, as required under *Rule* 4:46–2(c), defendant reviewed and approved plaintiffs' business model in his November 23, 2004 legal memorandum. Although defendant's legal opinion may not have absolved Richard Winstock of criminal responsibility for his actions, Mr. Winstock's admission of criminal culpability did not relieve defendant of his duty to provide plaintiffs with legally correct advice.

Even if Richard Winstock's statements before the criminal court were construed as an unequivocal admission that, at the time of his arrest, he was operating a "gambling resort" in violation of *N.J.S.A.* 2C:37–2a(2), such an admission is not dispositive of defendant's potential civil liability to plaintiffs for his alleged incorrect legal advice. *See State Farm Fire & Cas. v. Connolly,* 371 *N.J.Super.* 119, 122, 852 *A.*2d 227 (App.Div.2004). In *Connolly,* the plaintiff filed a declaratory judgment action to determine whether it had a duty to defend and indemnify its insured under a home owner's policy. *Ibid.* The insured had originally been charged with second degree aggravated assault, contrary to *N.J.S.A.* 2C:12–1b, which at the time exposed him to a presumptive term of imprisonment of seven years. *Ibid.* The insured decided to enter into a plea agreement with the State through which he pleaded guilty to third degree aggravated assault, in violation of *N.J.S.A.* 2C:12–1b(7). *Ibid.* He was sentenced to a five year term of probation. *Id.* at 123, 852 *A.*2d 227.

At the plea hearing, the insured "admitted" that he was in the location where a fight ensued involving the victim. *Ibid.* In the course of soliciting a factual basis for the plea, the insured's criminal attorney asked him the following: "At that time, did you act in a reckless manner, causing—with extreme indifference to [the victim], *causing him significant bodily injury?*" *The insured answered: "Yes." Ibid.* In the declaratory judgment action, the insured testified at his deposition that he was innocent of the charge of assault and that he was not even at the location at the time the victim was assaulted. *Ibid.* When State Farm reminded him of his admissions at the plea hearing, the insured gave the following explanation:

> I entered the plea for two reasons; one, it was an economic reason. I was already fifteen thousand into my lawyer. The second was if, in fact, somehow we took it to trial and I was guilty, there was a jail term of seven years [the presumptive term for a second degree offense]. So the prosecutor and my lawyer came up with if I took the plea there was going to be no jail time, it was going to be probation. But for those reasons I took the plea.

> [The insured] also provided certified answers to interrogatories in which he averred that he was not the individual who attacked and beat up [the victim] in the [location of the assault]. His answers to interrogatories 2 and 3 were as follows:
>
> 2. I have no knowledge of the occurrence set forth in the complaint, as I did not participate in any assault on the [victim].
>
> . . . .
>
> 3. I have no facts in connection with the alleged assault on the [victim], except to state that if the [victim] was assaulted, it was by some third person unknown to me.
>
> [*Ibid.* (first alteration and ellipsis in original).]

The trial court granted State Farm's summary judgment motion, concluding that the insured "was estopped from taking a position contrary to that which he had taken at the plea hearing in the criminal matter." *Ibid.* We reversed. *Id.* at 124, 852 *A.*2d 227. We held that the insured's admissions at the criminal hearing were admissible to impeach his credibility but were not dispositive as to the legal viability of his claim for coverage. *Ibid.*

Relying on *N.J.R.E.* 803(c)(22), *N.J.R.E.* 803(a), *N.J.R.E.* 803(b), and *N.J.R.E.* 613, we emphasized that "[c]ontrary to the motion judge's determination, our Supreme Court has held that collateral estoppel and other issue preclusionary doctrines do not preclude a person in a civil proceeding from taking a position inconsistent with his guilty plea." *Ibid.* Writing for a unanimous Court in *State Dep't of Law and Pub. Safety v. Gonzalez, supra,* Justice Coleman stated:

> It is beyond dispute that in a trial involving a cause of action based on tort or contract, a party's guilty plea may be used as affirmative, substantive evidence against that party. In such civil proceedings, the guilty plea is introduced into evidence as an admission, but it does not constitute conclusive proof of the facts underlying the offense. In that context, the party who has entered the plea may rebut or otherwise explain the circumstances surrounding the admission. Consequently, the doctrine of issue preclusion does not prevent the pleading party in the trial of a tort or contract claim from contesting the admitted facts.
>
> [142 *N.J.* at 629 (internal citations and quotation marks omitted).]

Returning to the issues raised by Richard Winstock here, to maintain an action for legal malpractice, plaintiffs must present evidence that: (1) they had an attorney-client relationship with Galasso that created a duty of care on Galasso's part; (2) Galasso

breached that duty by giving plaintiffs incorrect legal advice as to the legal propriety of their business model; and (3) the incorrect legal advice was a proximate cause of any economic damages plaintiffs sustained. *See Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 416, 678 *A.*2d 1060 (1996) (citing *Lovett v. Estate of Lovett,* 250 *N.J.Super.* 79, 87, 593 *A.*2d 382 (Ch.Div.1991)). Ordinarily, proximate cause is a jury question. *J.S. v. R.T.H.,* 155 *N.J.* 330, 351, 714 *A.*2d 924 (1998) (citing *Martin v. Bengue, Inc.,* 25 *N.J.* 359, 136 *A.*2d 626 (1957)).

Richard Winstock's admissions at the plea hearing may be evidential in his civil claims of professional malpractice against defendant. His plea alone, however, does not preclude him or Jennifer Winstock from arguing that defendant's alleged professional negligence was a proximate cause of the damages they incurred by operating the Fifth Street Club, LLC. It is undisputed that defendant represented plaintiffs in filing the necessary documents to create the LLC and represented plaintiffs before the Dover Zoning Board of Adjustment to obtain approval to operate the club. However, whether defendant was the mastermind and chief choreographer of a plan to mislead the Board and conceal the club's true purpose as a gambling resort, as plaintiffs claim, or, as defendant alleges, he was simply following the directions given to him by plaintiffs, are material issues of fact that cannot be resolved by way of summary judgment. *See Brill, supra,* 142 *N.J.* at 543, 666 *A.*2d 146.

■ Finally, we affirm the trial court's dismissal of plaintiffs' claims for emotional distress damages substantially for the reasons we made clear in *Gautam, supra:*

> [E]motional distress damages should not be awarded in legal malpractice cases at least in the absence of egregious or extraordinary circumstances. Whether viewed within the context of the traditional concept of proximate cause, or simply as a matter of sound public policy, we are convinced that damages should be generally limited to recompensing the injured party for his economic loss.
>
> [215 *N.J.Super.* at 399, 521 *A.*2d 1343 (internal citations omitted); *see also Garcia v. Kozlov, Seaton, Romanini & Brooks, P.C.,* 179 *N.J.* 343, 358, 845 *A.*2d 602 (2004).]

There is nothing in the record before us that substantiates a finding of "egregious or extraordinary circumstances" warranting this form of relief.

## V

The order of the Law Division granting defendant's motion for summary judgment and dismissing plaintiffs' legal malpractice action is reversed. The court's decision to dismiss plaintiffs' claims for emotional distress damages is affirmed. We remand the matter for such further proceedings as may be necessary and consistent with this opinion.

Reversed in part, affirmed in part, and remanded. We do not retain jurisdiction.