**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0649-23
     A-0650-23

GLOBAL LOGISTICS &
DISTRIBUTION, LLC,

  Plaintiff-Respondent,

v.

14 BURMA ROAD ASSOCIATES,
HENRY CHIU and 100 MIDDLESEX
AVENUE, LLC,

  Defendants-Appellants,

and

14 BURMA ROAD ASSOCIATES,

  Third-Party Plaintiff,

v.

GLOBAL LOGISTICS &
DISTRIBUTION, LLC, JAY KATZ,
GLOBAL LOGISTICS &
DISTRIBUTION INCORPORATED,
and GK EQUITIES LLC,

  Third-Party Defendants.

_____

Argued December 19, 2023 – Decided January 2, 2024

Before Judges Smith and Perez Friscia.

On appeal from an interlocutory order of the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. C-000218-19.

Jordan Michael Engelhardt argued the cause for appellants (A.Y. Strauss LLC, attorneys for 14 Burma Road Associates; Winnie W. Mok, attorney for appellants Henry Chiu and 100 Middlesex Avenue, LLC; Jordan Michael Engelhardt, Eric H. Horn, and Winnie W. Mok, on the joint brief).

Sean M. Lipsky argued the cause for respondents Global Logistics & Distribution, LLC, Jay Katz, Global Logistics & Distribution, Inc., and GK Equities LLC (Steinbach & Associates PC, Williams, Graffeo & Stern, LLC, and Cole Schotz PC, attorneys; Sean M. Lipsky, Lauren E. Komsa and Joseph Barbiere, on the brief).

PER CURIAM

On leave granted in these consolidated appeals, defendants 14 Burma Road Associates (Burma), Henry Chiu, and 100 Middlesex Avenue, LLC appeal from a September 5, 2023 Chancery Division order which granted partial summary judgment in favor of plaintiff Global Logistic & Distribution, LLC (Global LLC), dismissed Burma's counterclaims against Global LLC, dismissed Burma's third-party claims against Jay Katz and GK Equities, LLC, and denied

2

defendants' motion for partial summary judgment. Following our review of the record and applicable legal standards, we affirm.

I.

We view the following facts established in the summary judgment record in a light most favorable to defendants. See Friedman v. Martinez, 242 N.J. 449, 472 (2020). This commercial lease dispute concerns an option to purchase a 108,000-square-foot warehouse property located in Carteret.

On September 16, 2016, Global Logistics & Distribution, Inc. (Global Inc.) entered into a three-year lease with Burma to rent Unit 3 with an option to purchase. Burma was in the process of purchasing the property when it entered the lease. Chiu signed the lease as a partner of Burma, and Katz signed as a representative for Global Inc. Chiu and 100 Middlesex Avenue were Burma's general partners. At the time, Global Inc. was defunct and the State revoked its charter in 2010. Shortly before entering the lease, Katz had emailed Chiu a financial statement titled "Global Logistics & Distribution LLC Financial Statements," and a PNC Bank letter stating "Global Logistic and Distribution, LLC" was a customer in good standing.

The irrevocable option to purchase stated in pertinent part:

> Provided [t]enant shall not be in default under the terms
> and conditions of this [l]ease, [l]andlord hereby grants

3

to [t]enant, <u>or an entity related to [t]enant, an irrevocable and exclusive right to purchase the [b]uilding in "as is" condition for US $9,180,000.00 (the "[o]ption [p]urchase [p]rice"),[]</u> on the [third] anniversary of the [c]ommencement [d]ate (the "[o]ption [p]eriod"). <u>The closing shall occur within [ninety] days of [t]enant's exercise of the [o]ption.</u> . . . The parties to the [l]ease [a]greement acknowledge that the [o]ption constitutes a material inducement to tenant's entering into this [l]ease [a]greement.

[(Emphasis added).]

The option to purchase was to be exercised by October 31, 2019. The lease also included, "[i]n the event [t]enant exercises the option," the tenant's $400,000 deposit "along with any accrued interest, shall be applied to the [o]ption [p]urchase [p]rice." The option provision incorporated the terms and conditions of a prior closing between the parties for the sale of Unit 4, which required Burma to complete required environmental remediation. Specifically, the lease required "any current remediation . . . be completed prior to purchase and, if not completed, [t]enant shall not be responsible for the cost."

An assignment provision in the lease stated:

[A] transfer of the ownership interests controlling [t]enant shall be deemed an assignment of this [l]ease unless such ownership interests are publicly traded. . . . Tenant may assign or sublet the [p]remises, or any part thereof, to any entity controlling [t]enant, controlled by [t]enant or under common control with [t]enant (a

4

"[t]enant [a]ffiliate"), without prior consent of [l]andlord.

On October 26, 2016, at Burma's closing on Unit 3, Chiu, on behalf of Burma, and Katz, on behalf of Global LLC, signed an "Amendment to Lease Agreement." The one-page amendment altered part of the tenant's name from "Global Logistics & Distribution Inc." to Global LLC. The change was memorialized in handwriting on the signature line of the agreement where "Inc." was crossed out, and "LLC" was written in. Katz and Chiu each signed for their respective parties. The amendment changed the terms of the option to purchase provision as follows:

> Paragraph 36. **Option to Purchase**: Tenant shall have the irrevocable and exclusive option to purchase the [p]remises ("[o]ption") three . . . years from the [c]ommencement [d]ate of October 27, 2016. Tenant must exercise this [o]ption during the [o]ption [p]eriod as defined in the [l]ease [a]greement (the "[o]ption [p]eriod"). The closing of the [o]ption [p]urchase shall occur within [ninety] days of [t]enant's exercise of the [o]ption, but in no event prior to the third anniversary of the [l]ease [c]ommencement date.
>
> In the event [t]enant fails to exercise the [o]ption by the close of the [o]ption [p]eriod, which will be **on or before "October 31, 2019"** is herein changed to "**October 27, 2019 to November 27, 2019.**"

A-0649-23

On the same day, three additional documents were executed: a "Subordination, Nondisturbance and Attornment Agreement" (SNDA), a "Tenant Estoppel certificate" (certificate), and a promissory note.

Burma, Global LLC, and a Bank of New Jersey Executive Vice President executed the SNDA. The body of the SNDA named the "[t]enant" as "GLOBAL LOGISTICS & DISTRIBUTION," without further designation. During discovery, two different versions of the document were produced. Burma produced a copy that Katz, Chiu, and the bank executive signed with no handwritten correction to "LLC"; Global LLC produced a copy that Katz and Chiu signed with a handwritten correction to "LLC," but that was not signed by a bank executive. The bank separately produced a copy matching Global LLC's version.

Katz also signed the certificate with his signature below the tenant's name designation, where "LLC" was handwritten in, and "Incorporated" was crossed out. Also, a handwritten provision was added that stated, "Whereas the [t]enant has assigned the lease and all assets of the corporation to a new limited liability company to conduct operations and the shareholders of the corporations have become the members of the LLC." Katz signed the document as a "[m]ember" of Global LLC. Finally, Chiu executed a promissory note, on behalf of Burma,

6

for the $400,000 deposit. The promissory note named Burma as the borrower and "Global Logistics and Distribution, Inc." as the lender.

Michael Doran, counsel for Global LLC, testified at his deposition that at the time the amendment was signed, the designation "Inc." after Global's name was a "scrivener's error." Doran further testified once the error was realized at the October 26 closing, Katz changed the lease amendment and other documents from "Inc." to "LLC" in front of everyone involved.

During his deposition, Katz additionally testified that himself, his lawyer, Chiu, and defendants' counsel, Winnie Mok, realized the documents mistakenly named Global, Inc. as the tenant. Katz testified they "crossed ['Inc.'] out . . . so there was no question on that." Mok, confirmed at her deposition that the parties observed the discrepancy during the closing.

Mok testified that, on the certificate, the "Incorporated" designation was "crossed out and changed . . . to LLC." Mok later filed an "errata sheet" to withdraw her deposition testimony that she recalled a conversation regarding the correction of the Global entity's name and witnessed the handwritten correction by Katz.

Global LLC fulfilled its obligations under the three-year lease term. It paid approximately $50,000 per month in rent, property taxes, and condominium

7

common charges. Since at least 2018, Global LLC paid its rent with checks stamped "Global Logistic & Distribution, LLC." The checks often included "rent for . . . Unit[]3."

On July 31, 2019, Chiu emailed Katz, with the subject "exercise of the option," to set up a meeting to discuss the option to purchase. Contemporaneously, Chiu sought to obtain a mortgage loan secured by Unit 3 and had submitted to different banks a forged lease which mirrored the 2016 lease. The altered lease contained a 2017 commencement date and forged Katz's signature.

That September, Global LLC sent a letter to Chiu advising it would exercise the option to purchase. Burma's counsel also received a letter stating, "On behalf of [t]enant, Global Logistics & Distribution LLC and/or Global Logistics & Distribution Inc., . . . hereby exercises its option to purchase." The next month, Chiu informed Katz that Burma would not sell Unit 3. Global LLC's counsel reiterated its intention to "exercise . . . the option to purchase set forth in the lease." On October 30, Chiu unsuccessfully attempted to return the $400,000 security deposit, plus interest, to Katz. Global LLC's attorney again noticed its intention to "exercise[] its option to purchase the [p]roperty pursuant to the lease."

A-0649-23

In November, Burma changed its position and agreed to honor the purchase option "in accordance with the terms of the lease." In its communications to Global LLC, Burma issued a time of the essence notice stating it was prepared to sell "with a closing date of no later than December 27, 2019." Burma gave Global LLC less than the required lease term of ninety days to close on the property.

Global LLC informed defendants that GK Equities would be the official purchaser of the property. Fifteen days before the closing date set by Burma, counsel for Global LLC, emailed Mok regarding Burma's failure to provide necessary closing documents, including environmental remediation information. Mok forwarded an unsigned environmental "[r]emedial [a]ction [w]ork [p]lan." Global LLC rejected the "[eleven] month[-]old unsigned environmental proposal," and its counsel requested Mok "send [him] a signed copy, proof [Burma] paid it, and proof of remediation." The next day, Global LLC informed defendants it "ha[d] all the necessary funds and [wa]s willing to close Friday Dec[ember] 27" if Burma "complie[d] with all its requirements."

On December 18, having not received the requisite documentation required for the impending closing date, Global LLC filed a complaint against defendants. On December 26, counsel for Global LLC emailed defendants

regarding the missing documentation and concluded, "Based on the foregoing, if I do not hear from you by 3:30 [p.m.] today to address the multiple issues raised by both [Burma] and the title company, we will have no choice but to conclude that your client is not willing or able to close title tomorrow." Chiu informed Katz that Burma would not sell the property. Global filed an amended complaint on March 6, 2020. Defendants filed a joint answer on April 3.

The parties extensively litigated their claims, and the Chancery judge appointed a special discovery master. On leave granted, we previously addressed a prior order which adopted the special discovery master's recommendation and required defendants to produce records which were protected under the work-product privilege. We reversed and remanded for consideration consistent with our opinion. Global Logistic & Distrib. v. 14 Burma Rd. Assocs., No. A-1562-21 (App. Div. Oct. 13, 2022).

On December 9, 2022, Burma filed a counterclaim against Global LLC, and a third-party complaint against Katz, Global Inc., and GK Equities. On December 14, Global LLC filed a second amended complaint alleging claims of specific performance, breach of contract, breach of the covenant of good faith and fair dealing, and declaratory judgment.

On April 14, 2023, defendants moved for summary judgment to dismiss the counts in Global LLC's second amended complaint, discharge Global LLC's notice of lis pendens, and permit Burma's possession of Unit 3. Burma also moved for partial summary judgment on its third-party claims against Katz for negligent misrepresentation and piercing the corporate veil. On the same day, Global LLC moved for partial summary judgment on its claims for specific performance, breach of the covenant of good faith and fair dealing, and declaratory judgment, as well as seeking dismissal of Burma's counterclaims against Global LLC and the third-party claims against Katz and GK Equities.

On September 5, 2023, after hearing argument, Judge Thomas D. McCloskey entered an order accompanied by a written statement of reasons. He denied defendants' summary judgment motion entirely, granted Global LLC's motion for partial summary judgment, and dismissed Burma's counterclaims and third-party claims against Katz and GK Equities. Only Global LLC's breach of contract claim for damages and Burma's third-party claim against Global Inc., which was in default, remained.

In addressing the main point of contention—whether Global LLC was entitled as a matter of law to purchase the property from Burma—the judge found no material issues of fact existed to preclude Global LLC's right to

A-0649-23

purchase the property under the lease. Regarding whether Global LLC was the tenant and had the right to purchase the property, as demonstrated by the altered lease amendment and closing documents designating Global LLC as the tenant, the judge found:

> [T]he record shows neither party cared about the name of the entity . . . the course of performance clearly shows that Mr. Chiu knew that his tenant was the "LLC" entity at the latest in 2016 when at the October 26, 2016 closing, Burma's lender's counsel discovered the discrepancy between the corporate names, and as admitted by Winnie Mok. Apparently, all parties agreed that Mr. Katz would correct the error by crossing out the "Inc[.]" designation; replacing it with "LLC. . . ."
>
> . . . The designation of the entity with whom . . . [d]efendant was dealing amounted [sic] a distinction without a difference, since (a) . . . [d]efendants knew about the issue at the latest at the October 26, 20[]16 closing, (b) Burma, . . . [d]efendant-[l]andlord, affirmed the rights of the LLC entity by accepting the $400,000.00 deposit from the LLC entity; (c) Burma, . . . [d]efendant-[l]andlord, accepted twenty (20) months of rental payments from the LLC without raising an objection; (d) Burma, . . . [d]efendant-[l]andlord, used the financial statements of the LLC as proof to its own lenders of having this long-term tenant; (e) Burma, . . . [d]efendant-[l]andlord, relied on those same financial statements to receive a bank loan to purchase Unit 3; and ultimately (f) on November 15, 2019, it allowed the LLC entity to exercise the [o]ption as the tenant. . . .
>
> . . . .

A-0649-23

Lastly, at least regarding the LLC versus Inc. issue, Mr. Katz wrote and assigned Global's rights under the agreement from the Inc entity—which was defunct since 2010—to the LLC entity. While he may have never did so formally or even notified . . . [d]efendant-[l]andlord, the [l]ease [a]greement allowed him to do so, without notification so long as it was to an affiliated entity:

> Notwithstanding the above, [t]enant may assign or sublet the [p]remises, or any part thereof, to any entity controlling [t]enant, controlled by [t]enant or under common control with [t]enant (a "[t]enant [a]ffiliate"), without the prior written consent of [l]andlord.

After finding Global LLC was the tenant under the lease and had the option to purchase the property, the judge determined Global LLC was entitled to specific performance because it had met all the required terms of the irrevocable option to purchase the property and Burma had breached the agreement. The judge reasoned:

> The record is clear and undisputed that Global, through Jay Katz, fulfilled all its obligations in good faith under both the [l]ease and [o]ption agreement; it remitted all the rental payments and paid the $400,000 payment as required by the non-revocable [o]ption. On multiple occasions it timely exercised the [o]ption within the option period, early on September 12, 2019 and on September 24, 2019, and timely (within the [o]ption [p]eriod) on October 10, 2019 and October 30, 2019. Certification of Jay Katz. . . . The record further reflects that when Global recalculated the amount of

13

rent it paid during the tenancy in response to [d]efendants' claim that the [o]ption cannot be exercised due to Global['s] being in default of rent, it overpaid the rent. There is and can be no genuine dispute that Global fulfilled its obligations under the [l]ease [a]greement and its amendment.

. . . .

. . . The [o]ption provided for a [ninety]-day period in which to close from the exercise of the [o]ption, but in no event prior to the third anniversary of the [l]ease [c]ommencement [d]ay, i.e., October 27, 2019. Thus, . . . [p]laintiff should have had until January 27, 2020, the full [ninety] days to close on Unit 3. However, . . . [d]efendants issued an improper "time-of-the-essence" for December 27, 2019 giving them only [forty-two]—not [ninety]—days. Thereafter on January 17, 2020 - prior to the expiration of the [ninety] days.

. . . .

. . . [T]hese two breaches resulted in not knowing if, in reality, . . . [p]laintiff would not have been able to secure the proper financing had they been given the opportunity to utilize the full [ninety]-day period as provided for in the October 26, 2016 [a]mendment "[t]he closing of the [o]ption [p]urchase shall occur within [ninety] days...."

. . . .

. . . Burma did not provide a [r]esponse [a]ction [o]utcome [r]eport ("RAO") regarding the environmental cleanup, Burma did not even provide a [r]emedial [a]ction [w]ork [p]lan ("RAP") detailing the work that needed to be done to obtain the RAO, for

14

which the closing parties could have executed a written acknowledgement of Burma's responsibility—as per the [l]ease—for the remediation after the closing, and place some of the closing monies in escrow—to ensure payment by Burma—based on a remedial plan that was never provided to Global.

The judge concluded defendants failed to demonstrate a genuine issue of material fact to preclude it from granting Global LLC's claims seeking enforcement of the sale of the property.

On appeal, defendants argue the judge erroneously: applied extrinsic evidence to vary the unambiguous lease terms; made incorrect factual determinations to conclude Global LLC could enforce the option; weighed credibility considerations; relied on inadmissible evidence of settlement communications; found Burma "[r]atified" the lease as to Global LLC without adequate support in the record; relied on White v. Dvorak, 896 P.2d 85 (Wash. 1995) and K&J Clayton Holding Corp. v. Keuffel & Esser Co., 113 N.J. Super. 50 (Ch. Div. 1971); found a lease assignment; failed to consider the evidence Global LLC was financially unable to close; and found the lease required Burma to provide an environmental remediation. In their supplemental brief, defendants additionally argue the judge erroneously denied Burma's motion for summary judgment as to the alleged veil piercing and negligent

misrepresentation claims.  Global LLC, Katz, and GK Equities oppose the arguments.

Having considered these contentions in light of the record and applicable law, we affirm substantially for the reasons stated in Judge McCloskey's cogent and well-reasoned decision.  We add the following comments.

## II.

We review a trial court's summary judgment decision de novo, "applying the same standard used by the trial court" under Rule 4:46-2(c).  Samolyk v. Berthe, 251 N.J. 73, 78 (2022).  "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).  To rule on summary judgment, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007)).

A-0649-23

"A dispute of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Gayles by Gayles v. Sky Zone Trampoline Park, 468 N.J. Super. 17, 22 (App. Div. 2021) (quoting Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017)). "Rule 4:46-2(c)'s 'genuine issue [of] material fact' standard mandates that the opposing party do more than 'point[] to any fact in dispute' in order to defeat summary judgment." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (alteration in original) (first quoting R. 4:46-2(c); and then quoting Brill, 142 N.J. at 529). Insubstantial arguments based on assumptions or speculation are not enough to overcome summary judgment. Brill, 142 N.J. at 529; see also Dickson v. Cmty. Bus Lines, Inc., 458 N.J. Super. 522, 533 (App. Div. 2019) ("'[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome' a motion for summary judgment." (quoting Puder v. Buechel, 183 N.J. 428, 440-441 (2005))). Notably, a proffered self-serving sworn statement, on its own, does not incontrovertibly create a material issue of fact. See Carroll v. N.J. Transit, 266 N.J. Super. 380, 388 (App. Div. 2004).

A-0649-23

"A contract arises from offer and acceptance and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (quoting Borough of W. Caldwell v. Borough of Caldwell, 26 N.J. 9, 24-25 (1958)). "Courts enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (quoting Caruso v. Ravenswood Devs., Inc., 337 N.J. Super. 499, 506 (App. Div. 2001)). "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila v. Bd. of Educ., 241 N.J. 595, 616 (2020) (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)).

"The interpretation of a contract is generally subject to de novo review." Arbus, Maybruch & Goode, LLC v. Cogen, 475 N.J. Super. 509, 511 (App. Div. 2023). We apply basic principles of contract interpretation to a lease. See Town of Kearny v. Disc. City of Old Bridge, Inc., 205 N.J. 386, 411 (2011). Contract terms are generally "given their plain and ordinary meaning." M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002). "The judicial task is simply

18

interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011). However, "we permit a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties." Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 270 (2006); see also Renee Cleaners, Inc. v. Good Deal Super Mkts., Inc., 89 N.J. Super. 186, 190 (App. Div. 1965) ("In general, the polestar of construction is the intention of the parties as disclosed by the language used, taken in its entirety, and evidence of the attendant circumstances may be considered, not to change the agreement made but to secure light by which to measure its actual significance.").

"In a real estate transaction, an option contract is a unilateral agreement requiring a party to convey property at a specified price, provided the option holder exercises the option 'in strict accordance' with the terms and time requirements of the contract." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 223 (2005) (quoting State ex rel. Adams v. N.J. Zinc Co., 40 N.J. 560, 576 (1963)). Acceptance of an offer must be clear and unequivocal, not ambiguous. Looman Realty Corp. v. Broad St. Nat'l Bank of Trenton, 74 N.J. Super. 71, 82 (App. Div. 1962).

A-0649-23

Ratification occurs where an entity "voluntarily accept[s] the benefits accruing" under a contract "after full knowledge, and having full liberty to decline the same." H. Horowitz, Inc. v. Weehawken Tr. & Title Co., 10 N.J. Misc. 417, 421 (Sup. Ct. 1932). Contract "[r]atification requires intent to ratify plus full knowledge of all the material facts." See Thermo Contracting Corp. v. Bank of N.J., 69 N.J. 352, 360-61 (1976). The meaning of ratification of a contract is similar to the general meaning of ratification in agency law. Id. at 360-61. "Ratification may be express or implied, and intent may be inferred from the failure to repudiate an unauthorized act." Id. at 361.

"[T]he right to specific performance turns not only on whether plaintiff has demonstrated a right to legal relief but also whether the performance of the contract represents an equitable result." Marioni v. 94 Broadway, Inc., 374 N.J. Super. 588, 599 (App. Div. 2005).

> [W]hen specific performance is sought, the court is required to do more than merely determine whether the contract is valid and enforceable; the court of equity must also "apprise the respective conduct and situation of the parties," the clarity of the agreement itself notwithstanding that it may be legally enforceable, and the impact of an order compelling performance, that is, whether such an order is harsh or oppressive to the defendant, or whether a denial of specific performance leaves plaintiff with an adequate remedy.
>
> [Id. at 600 (citations omitted).]

"[A]s a consequence of the remedy's equitable underpinnings, the party seeking specific performance 'must stand in conscientious relation to his adversary; his conduct in the matter must have been fair, just and equitable, not sharp or aiming at unfair advantage.'" Ibid. (quoting Stehr v. Sawyer, 40 N.J. 352, 357 (1963)).

"A Chancery judge has broad discretion 'to adapt equitable remedies to the particular circumstances of a given case.'" Tarta Luna Props., LLC v. Harvest Rest. Grp., LLC, 466 N.J. Super. 137, 153 (App. Div. 2021) (quoting Marioni v. Roxy Garments Delivery Co., 417 N.J. Super. 269, 275 (App. Div. 2010)).

## III.

Defendants' arguments that the judge erred in varying the clear lease terms based on extrinsic evidence is without merit. Although Global Inc. was the named tenant on the lease, Chiu and Katz executed the amendment within a few weeks after the lease was signed naming Global LLC. Katz altered the lease amendment to reflect the tenant's name change to Global LLC at Burma's Unit 3 closing. At the closing, Katz also altered the SNDA and the certificate to reflect Global LLC as the tenant. A review of the documents demonstrates that in both documents, near the tenant's signature line, the letters "LLC" were handwritten in and "Inc." or "Incorporated" was crossed out. Katz's signature

21

on each document was under the alteration of Global's identity designation to LLC. Notably, the amendment changed the time period for the LLC to exercise the option to purchase. We discern no error in Judge McCloskey's decision that the record established defendants knew the "tenant was the 'LLC' entity at the latest in 2016" at the October closing when the name error was corrected "for all the documents." At the closing, Burma accepted the amendment to Global LLC.

Defendants' argument that the amendment did "not change the [l]ease provision identifying the [t]enant as Global Inc." ignores that the change to Global LLC was at the signature line where Katz signed on behalf of the tenant. The amendment is a one-page document. It is undisputed that the changes were made at Burma's closing on the property in the presence of counsel and Chiu. Defendants' argument that the alteration was not initialed by Chiu is unpersuasive.

We also conclude the argument that a material issue of fact exists regarding Global LLC's status as a party to the lease with the ability to exercise the option to purchase is unsupported by the record. Specifically, defendants argue a question of fact exists as to whether Global LLC was the legally identified tenant under the lease. In arguing that the lease amendment did not

22

create a tenancy with Burma, defendants highlight Mok's redacted statement outlining her specific recollection regarding the signed certificate.

When asked at her deposition about the certificate's handwritten LLC correction, Mok testified Katz changed the entity designation to LLC at the closing after an inquiry from the bank's counsel, Michael Messer. Mok testified Messer "was surprised to see the . . . discrepancy. So that's why he added that paragraph at the end of the estoppel certificate." Again, in addition to the handwritten "LLC" and "Inc." cross-out, the document additionally in handwriting states, "Whereas the [t]enant has assigned the lease and all assets at the corporation to a new limited liability company to conduct operations and the shareholders of the corporations have become the members of the LLC." Both Katz and Doran testified to the accuracy of the documents. Burma's assertion that the modification went unnoticed is unavailing. Further, we note the same modified SNDA was produced in discovery by both Global LLC and the bank.

We discern no error in the judge's rejection of Mok's redaction of her specific recollection regarding the name correction on the certificate and the conversation regarding the LLC. See Metro Mktg., LLC v. Nationwide Vehicle Assurance, Inc., 472 N.J. Super. 132, 275 (App. Div. 2022) ("Pursuant to [the sham affidavit] doctrine, judges who rule on summary judgment motions are not

bound to consider 'a purely self-serving certification' by a party 'that directly contradicts his [or her] prior representations in an effort to create an issue of fact.'" (quoting Winstock v. Galasso, 430 N.J. Super. 391, 396 (App. Div. 2013))).

A de novo review of the record demonstrates, as the judge found, no material issues of fact exist to preclude summary judgment in favor of Global LLC, ordering specific performance as to the sale of the property, and dismissing defendants' claims. We reject defendants' argument that Global LLC was "an entity with no rights under the operative lease." While the alteration of Global's entity designation was supported by substantial deposition testimony of parties in attendance at Burma's closing and collateral evidence, the lease documents speak for themselves, and a review of extrinsic evidence outside of the lease documents was unnecessary. Burma's arguments as to Global LLC's inability to perform are also without merit as it is uncontroverted that the lease provided for ninety days to close on the option and Burma has not established Global LLC could not procure the necessary funding.

Finally, the judge, after finding the lease amendment and closing documents were changed to perfect Global LLC as the tenant, further found "[b]ased on the conduct" of Chiu and Burma the lease was "ratified" to provide

"that the LLC entity was the party" to the lease. Although we need not reach this argument, we only add that the record supports the judge's finding that ratification occurred. See MacLeod v. Ajax Distrib. Co., 22 N.J. Super. 121, 127 (App. Div. 1952) ("To ratify means to approve and sanction. It presupposes knowledge or at least some alerting circumstantial information of the unauthorized action.").

To the extent that we have not addressed defendants' additional arguments, it is because they lack sufficient merit to be discussed in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0649-23